**Edwin E. FOSTER, Appellant,**

v.

**W. H. BULLARD et al., Appellees.**

**No. 12500.**

Court of Civil Appeals of Texas,
Austin.

July 20, 1977.

Rehearing Denied Aug. 10, 1977.

Joe A. Osborn, Kendall, Randle, Finch & Osborn, Austin, for Edwin E. Foster.

J. P. Darrouzet, Austin, for Mutual Savings Institution.

O'QUINN, Justice.

An earlier phase of this lawsuit reached this Court on appeal from grant of motions for summary judgment filed by the several defendants against whom Edwin E. Foster brought the original action in 1970 to enforce terms of a first refusal option agreement to purchase fifty acres of land out of the James Standifer Survey in Travis County west of Austin near Barton Creek. *Foster v. Bullard*, 496 S.W.2d 724 (1973), writ ref'd n. r. e.

We reversed judgment of the trial court, and, having before us only the issue of whether the motions for summary judgment for the appellees were improvidently granted, there being no motion for summary judgment filed by appellant, we remanded the cause for trial on authority of *Hinojosa v. Edgerton*, 447 S.W.2d 670, 673 (Tex. 1969). See also *Alamo National Bank v. Hurd*, 485 S.W.2d 335, 342 (Tex.Civ.App. San Antonio 1972, writ ref'd n. r. e.).

With only minor rearrangement of parties defendant, the cause was tried before the district court without a jury in March of 1976, after which the trial court on April 29 entered judgment that Foster was entitled to specific performance in purchase from Mutual Savings Institution of 47.96 acres of land, but under terms and conditions calling for payment at $3,000 an acre.

From this judgment Foster appeals and brings ten points of error. In the main, Foster contends that the court erred in requiring him to pay $3,000 an acre for the land instead of $750 per acre under terms of the original option agreement. Mutual Savings and other defendants appeal and bring six points of error, under which their principal contention is that the trial court erred in following the findings and holding of this Court as stated in our opinion in 1973.

We will modify the trial court's judgment to provide that Foster be required to pay no more than $750 per acre for the 47.96 acres of land, and as modified the judgment will be affirmed. The contentions made by Mutual Savings, which the other appellants adopted, will be overruled.

For statement of the facts out of which this controversy arose, reference is made to our opinion of 1973, in which contracts are described, actions of the parties are related, and a sketch of the land in controversy appears on page 728. (496 S.W.2d 726–732).

In remanding the cause on its prior appeal, this Court stated: "Whatever performance duty is placed on appellant [Foster, in that instance] would depend upon determination by a court of what the actual trade was between Casa Monte [the corporate entity owned by Bullard and wife] and Mutual in fact and in law." (496 S.W.2d 724, 737, Col. 2).

We conclude from the record, and application of law to the facts, that Foster's performance duty is to pay a per-acre price for the 47.96 acres "consistent with the offer" Bullard finally accepted, "but not less than $750.00 per acre." We conclude that the sale to Mutual of that tract, as well as the entire ranch, consisting of nearly 2,500 acres, was at a price of $650 an acre. Therefore, under the facts of the sale finally made by Bullard to Mutual on August 28, 1969, Foster was entitled to buy the 47.96 acres of land at not less than $750 per acre.

To review briefly the contracts leading up to the final sale of Casa Monte Ranch, which sale also included the 47.96 acres in controversy, we begin with the contract between W. H. Bullard (acting for Casa Monte corporation) and Edwin E. Foster. Foster bought 30 acres from Bullard, out of the Casa Monte Ranch, in March of 1967. The 30 acres comprised the south portion of an 80-acre tract, leaving about 50 acres (later surveyed and found to be 47.96 acres) which the parties agreed Foster would have a "first refusal right" to buy at a price consistent with other offers "but not less than $750.00 per acre."

Subsequently, after the death of Bullard's wife, Bullard and the Capital National Bank, executor of Mrs. Bullard's estate, determined that Casa Monte Ranch should be sold in its entirety for estate tax reasons. Bullard authorized Bob Howerton as agent to find a buyer. In course of negotiations between Howerton and H. B. Hendrix, Hendrix offered to buy the ranch, estimated to contain 2,460 acres, for $1,600,000.00. Bullard and the bank accepted the offer.

After the agreement as to price had been reached, Bullard told Hendrix the sale would be subject to Foster's right of "first refusal" and it would be necessary to allocate part of the purchase price to a certain 164-acre tract for that purpose. Bullard pointed out to Hendrix a plat which Bullard stated was the tract of 164 acres he had described in the contract and told Hendrix that the tract joined Barton Creek on the south.

Bullard and Hendrix talked about value of the 164 acres in terms of $3,000 to $3,500 an acre. Hendrix was under the impression the 164-acre tract was more valuable than other portions of the ranch because Hendrix (and Howerton also) believed the tract had frontage on Barton Creek. The tract in fact had no frontage on the creek because of the prior sale by Bullard to Foster of the 30 acres which lies between Barton Creek and the 164 acres. (See sketch, 496 S.W.2d 728). Hendrix at trial testified he did not know whether he had ever been on the 164 acres, did not know whether it had a road on it, and did not know whether the land adjoined land Hendrix already owned in that area; nor did Hendrix know whether the 164-acre tract had frontage on Highway Loop 360.

Bullard testified that on January 12, 1969, he and Hendrix reached "an overall basis of understanding" and that the following day he assembled all the deeds and records and dictated the contract they executed. The contract described the ranch as ". . . 2,460 acres, more or less . . . said tract being commonly known as the 'Casa Monte Ranch' and specifically described in three deeds as follows . . . ."

The contract described the three deeds and stated the acreage as "more or less" in each deed. The deeded acreage so specified designated "First Tract" (containing "approximately 164 acres"), "Second Tract", and "Third Tract" (the latter two containing together 2,295 acres "more or less").

The Hendrix contract then specified the total consideration to be $1,600,000.00, and after setting out terms of payment, provided: " . . . said total consideration of $1,600,000.00 is based upon the following allocations:

| FIRST TRACT | $ 492,800.00, and |
| SECOND TRACT AND | |
| THIRD TRACT | $1,108,000.00 |
| TOTAL | $1,600,000.00" |

The contract provided that a designated surveyor would survey "the entire tract of approximately 2,460 acres," and that " . . any variance as to quantum of land shall result in the adjustment in the total price of $650.00 per acre for excess land above the 2,460 acres or for any deficiency in the computed acreage . . . "

The contract also provided: "It is understood and agreed that Edwin E. Foster has the right of rejection for a period of ten (10) days for the purchase of the FIRST TRACT at the price above stated; this contract is subject to his right to exercise this purchase option."

It is clear from the record that Hendrix and Bullard at all times negotiated regarding sale of the entire ranch consisting of what the parties believed to be 2,460 acres of land. Hendrix never made an offer to purchase either the 164 acres or the 47.96 acres subject to the "first refusal" option contract, nor did Hendrix offer to buy either of these tracts for $3,000 an acre; nor did Bullard at any time offer either the 164 acres or the 47.96 acres for sale to Hendrix.

Bob Howerton was present during the negotiations and when the contract was drafted. Howerton testified that Hendrix never indicated he would pay $3,000 an acre for the 164 acres if Bullard would sell it separately, and that Bullard never offered to take $1,108,000.00 for the 2,296 acres in the "Second" and "Third" tracts. No independent appraisals were made of any part of the ranch as a basis for sale negotiations or the allocation of the sales price Bullard placed in the contract.

The contract between Bullard and Hendrix was executed on January 13, 1969, and on the same day notice was sent to Foster that " . . . Casa Monte Company has contracted to sell 164 acres of land which includes the 50 acres [later by survey found to be 47.96 acres] set out in the memorandum agreement at a price of $3,000.00 per acre . . . "

In May of 1969, following the contract in January, a perimeter survey of the ranch disclosed that it contained 2,487.07 acres of land, or 27.07 acres more than the acreage mentioned in the contract. No separate survey was made to determine the amount of excess or deficiency in the "First (164-acre) Tract" alone.

Thereafter Hendrix decided not to complete his contract with Bullard, and subsequently, on July 25, 1969, upon being reimbursed for the $25,000 in earnest money he had posted, Hendrix assigned his interest in the contract of January 1969 to Mutual Savings in an instrument reciting that he did " . . . hereby intend to place The Mutual Savings Institution in my position as Purchaser under said contract of Sale." Mutual accepted the assignment and Bullard accepted Mutual.

The sale to Mutual Savings was not closed until August 28, 1969, after Mutual and Bullard had renegotiated the transaction. The deed executed in August to Mutual conveyed the ranch in two tracts, instead of three. "Number One" tract recited 2,486.82 acres, and "Number Two" tract recited 0.25 acres,[1] a total of 2,487.07 acres,

---

1. This small tract appears to have been separated in this fashion out of consideration for the ranch foreman who had an option to buy his house located on that one-fourth of an acre.

the acreage determined by the perimeter survey earlier in May. The deed recited consideration as $10.00 and other good and valuable consideration, plus a purchase money promissory note for $1,455,835.95. At the closing, Mutual executed a deed of trust to secure payment of the note describing the 2,487.07 acres in the same two tracts as the deed. Prior to closing, application was made for a title policy to be issued on the ranch for benefit of Mutual. The application covered the entire 2,487.07 acres of the ranch at the total amount of the purchase price. The policy issued later conformed to the application, without insurance on separate tracts at different values. Also at the closing in a Memorandum of Agreement for a trespass to try title suit, adjustment was provided at $650.00 per acre for title failure, since Bullard at the time was unable to furnish Mutual a title policy prior to suit.

As appears in our first opinion (496 S.W.2d 724, 731), Foster did not learn that Bullard had sold the ranch, including the tract Foster had a "first refusal" option to buy, until some time in September of 1969, when he read in a newspaper of the sale a month earlier to Mutual of the "2,500-acre ranch" for which Mutual was "paying $1.6 million." Foster had no prior notice of the sale to Mutual, and the notice he had in January of that year, pertaining to the Hendrix contract, advised only that ". . . Casa Monte Company has contracted to sell 164 acres of land which includes the 50 acres set out in the memorandum agreement at a price of $3,000 per acre . . ."

In this appeal Foster contends that the sale to Mutual was made on a "per acre" basis for $650 per acre. Mutual argues that 164 acres of the ranch were sold for $3,000 per acre, and that the remaining 2,323.07 acres sold for $1,125,590.33, or an average of $484.52 per acre. The trial court found (Finding No. 59) that "Mutual in good faith paid to Bullard and Casa Monte the sum of $150,000.00 for the 50 acres [47.96, by survey] which is the subject of this law suit."

This finding is without support in the evidence, save in provisions of the original Hendrix contract, which Mutual later acquired and renegotiated with Bullard. The controlling facts are the price and terms of the sale from Casa Monte, Bullard, and the Capital National Bank to Mutual Savings late in August of 1969.

Mutual acquired the entire Casa Monte Ranch and with it bought the disputed 47.96-acre tract on which Foster had a "first refusal" option. On the same date the deed to the ranch passed, four instruments were executed: (1) a contract titled "Memorandum of Agreement," (2) the deed, (3) a purchase money promissory note, and (4) a deed of trust to secure the note. The deed itself, as already observed, described *two* tracts of land, whereas the Hendrix contract had described *three* tracts, with consideration allocated to the 164-acre tract separately from consideration allocated to the other two tracts. The deed of trust followed the same description of two tracts found in the deed to Mutual, and in neither instrument was there any separation or allocation of consideration.

The four instruments, executed contemporaneously on August 28, 1969, will be construed together, since they were executed at the same time, relate to the same subject matter, and are between the same parties. *Miles v. Martin*, 159 Tex. 336, 341, 321 S.W.2d 62, 65 (1959); *Fleming v. Todd*, 42 S.W.2d 123, 126 (Tex.Civ.App. Beaumont 1931, writ dsm'd). The Supreme Court in *Miles* pointed out that application of such principle constitutes ". . . simply a device for ascertaining and giving effect to the intention of the parties . . ."

The critical portion of the final trade between Mutual and Bullard concerns consideration actually paid for the 47.96-acre part of the ranch. Neither the deed, the memorandum agreement, the deed of trust, nor the promissory note shows the 47.96-acre tract segregated from the balance of

the ranch, and no instrument provides any basis for showing a distinction of any sort made in the sale price of different parts of the ranch.

The next step is to determine whether the sale was *in gross* or *per acre*, and if by the acre, the consideration *per acre* for the ranch.

In arriving at a consideration of $650 per acre for the ranch, including the disputed tract of 47.96 acres, we follow the rule applied by the Supreme Court in *Denman v. Stuart*, 142 Tex. 129, 133, 176 S.W.2d 730, 732 (1944), and followed later in *Lyons v. Keith*, 316 S.W.2d 785, 794 (Tex.Civ.App. Beaumont 1958, writ ref'd n. r. e.). In those cases the problem was to determine the value of land where an excess or a deficiency in acreage was discovered after completion of the sale. In neither case was the court considering value of a tract, sold as part of a larger tract, on which there was an outstanding "first refusal" purchase option. But in the present case, where there occurred a title failure as to the 47.96 acres, the same principle of adjustment seems appropriate and will be adopted and applied in this case.

In *Denman, supra*, the court adopted the appraisement which the parties made when they finally closed their trade, and the court observed, "We are content to adopt the appraisement which the parties made when they entered into the contract . . . ." In the present case, as in *Lyons, supra*, the evidence supports the conclusion that the parties agreed that each acre as a part of the undivided whole of the ranch would be considered to have the same value, in this case $650 *per acre*. There is nothing tending to show the contrary, save the Hendrix contract, made in January and assigned to Mutual in July, and renegotiated with substantially different results at the final sale late in August.

The Hendrix contract of January 13, 1969, was considered by this Court on the prior appeal, in which it was pointed out

that the final paragraph of that contract constituted notice to Mutual of Foster's "first refusal" option. No one of the instruments at closing on August 28, 1969, refers to the Hendrix contract in any manner material to the 47.96 acres. The sale in August described the ranch in two tracts, recited a lump sum consideration, and provided for title defect adjustment at $650 per acre.

No officer or official acting in behalf of Mutual at the time of acquisition of the Hendrix contract, renegotiation of the trade with Bullard, or in closing the final trade in August testified that the 47.96 acres of land had a separated value of $3,000 an acre, or that any person acting for Mutual sought to buy that tract separately and upon a basis different from purchase of the entire ranch at so much per acre for a lump sum figure. In fact, the minutes of the board of directors for Mutual reflect that as early as July 23 a report of its executive committee, instructed earlier on July 14 to investigate "purchase of the 'Bullard Ranch,'" was received, and the Institution was that day "authorized to purchase . . . [the] tract of land . . . known as the 'Bullard Ranch,' containing 2,487.07 acres of land, more or less, for $650.00 per acre or for a total consideration of $1,616,595.50 . . . ."

One of Mutual's officers testified that he considered Mutual was purchasing the ranch on a *per acre* basis. The executive committee, instructed on July 14 to study and investigate the matter of purchasing the ranch, made its recommendation based on the perimeter survey of May, 1969, which showed 2,487.07 acres in the ranch, at $650 per acre to calculate the recommended purchase price of $1,616,595.50. Adjustment for the extra 27.07 acres, revealed by the survey made in May, was based on $650 per acre.

Mutual's president, testifying about the period of negotiations between July 14 and

August 28, did not recall any mention of $3,000 per acre for any part of the ranch, and was unable to identify the portion of the ranch Mutual now contends it paid $3,000 an acre for.

Mutual's controller calculated the cost of the ranch, employing a cost basis of $650 per acre, which was accepted by Mutual's independent auditors and was known to its executive officers. The controller's testimony shows that Mutual consistently treated the sale of the ranch as one by the acre, for $650 per acre, not only in bookkeeping records, but also when calculating cost basis for income tax purposes, and when reporting to regulatory agencies. No evidence was introduced showing that Mutual, for financial, tax, or any other purpose, at any time treated any part of the ranch it had bought on August 28, 1969, as costing $3,000 an acre. The highest evidence of intention can be found in the practical construction placed upon a contract by the parties themselves. *Lone Star Gas Co. v. X-Ray Gas Co.*, 139 Tex. 546, 553, 164 S.W.2d 504, 508 (1942); *Superior Oil Co. v. Stanolind Oil and Gas Co.*, 150 Tex. 317, 323, 240 S.W.2d 281, 285 (1951).

We conclude that the closing instruments of August 28 evidence the final integrated agreement and clearly show what character of trade Mutual and Bullard made. We regard the provisions of the earlier Hendrix contract which are inconsistent with the closing instruments of August 28 as either part of preliminary negotiations or as having their sole purpose in providing a basis for notice to Foster. There is some testimony that Mutual officers believed that Foster no longer had a valid claim to his right of "first refusal."

The inconsistent parts of the Hendrix writing were either rejected by the parties or abandoned in the trade consummated on August 28. No such provisions were carried forward in the closing instruments. Terms of the January 13 Hendrix contract are evidence inconsistent with the integrated sale agreement and are not competent to support the trial court's findings that on August 28 Mutual paid $3,000 per acre for the 47.96 acres. The written instruments by which Mutual bought, and by which Bullard sold, the entire Casa Monte Ranch must be presumed to embrace the entire contract, and the prior inconsistent matters contained in the Hendrix contract, even if received in evidence by consent, cannot overcome that presumption. See *Austin Bros. v. Patton*, 294 S.W. 537, 539 (Tex. Comm.App.1927); 21 Tex.L.Rev. 778, 787; *Tackett v. Cunningham*, 91 S.W.2d 965, 968 (Tex.Civ.App. San Antonio 1936, no writ).

We have considered Foster's first four points of error, under which we have disposed of the issues we decide favorably to Foster's contentions. Under the remaining points of error Foster claims error of the trial court in findings which are inconsistent with our holding just stated. We sustain the points of error without further elaboration.

We hold that Foster, as the trial court held, is entitled to specific performance to acquire the 47.96 acres of land in dispute, and we further hold, contrary to the findings and conclusions of the trial court, that Foster is entitled to buy the 47.96 acres of land at a price of $750 per acre.

Mutual, as already observed, brings six points of error in its role as appellant. In the main, Mutual seeks by these claims to challenge the holdings of this Court in its prior opinion and to assign error to the trial court because that court heeded and followed our opinion. Without further discussion, all of Mutual's points of error are overruled.

The judgment of the trial court is modified to provide that in exercising the right of specific performance Foster shall not be required to pay more than $750 per acre for the 47.96 acres described in the trial court's judgment. As so modified, judgment of the trial court is affirmed.