**NAVASOTA RESOURCES, L.P., Appellant,**

v.

**FIRST SOURCE TEXAS, INC., First Source Gas, LP, Gastar Exploration Texas, LLC f/k/a Bossier Basin, LLC, First Texas Gas, LP, First Source Bossier LLC, Gastar Exploration, LTD., Chesapeake Energy Corp., Chesapeake Exploration, LP & Chesapeake Operating, Inc., Appellees.**

No. 10–06–00236–CV.

Court of Appeals of Texas, Waco.

Jan. 9, 2008.

Rehearing Overruled March 18, 2008.

Kent Rutter, and Lynne Liberato, Haynes & Boone, LLP, Houston, Gayle Wilson Ray, Buffalo, for appellant.

James D. Thompson III, Vinson & Elkins LLP, Jesse R. Pierce, King & Spalding, Houston, Roger Knight, Jr., Roger Knight Jr., Inc., Madisonville, Bryan F. Russ, Jr., Palmos Russ McCullough & Russ LLP, Hearne, for appellees.

Before Chief Justice GRAY, Justice VANCE, and Justice REYNA.

## OPINION

FELIPE REYNA, Justice.

Navasota Resources, L.P. filed suit to enforce a preferential right provision in a joint operating agreement it had with First Source Texas, Inc. The trial court granted summary judgment motions filed by: (1) First Source, its parent company Gastar

Exploration Texas, L.P., and other related entities; and (2) Chesapeake Energy Corp. and two related entities. The court denied a summary judgment motion filed by Navasota. Navasota contends in two issues that the court erred by: (1) granting the summary judgment motions filed by the First Source/Gastar entities and the Chesapeake entities; and (2) denying the summary judgment motion filed by Navasota. We will reverse and render in part and reverse and remand in part.

## Background

The joint operating agreement applies to certain oil and gas interests in an area of mutual interest straddling the Navasota River along the boundary between Leon and Robertson Counties. The parties refer to the property included in the joint operating agreement as the "Hilltop Prospect." At the time the parties executed the joint operating agreement, Navasota owned an undivided fifty-five percent working interest in these lands, and First Source owned an undivided forty-five percent working interest. The operating agreement is a standard agreement, Form 610–1989, promulgated by the American Association of Petroleum Landmen.[1]

This agreement contains the following provision regarding the preferential right which Navasota seeks to enforce:

> Should any party desire to sell all or any part of its interests under this agreement, or its rights and interests in the Contract Area, it shall promptly give written notice to the other parties, with full information concerning its proposed disposition, which shall include the name and address of the prospective transferee (who must be ready, willing and able to purchase), the purchase price, a legal description sufficient to identify the property, and all other terms of the offer. The other parties shall then have an optional prior right, for a period of ten (10) days after the notice is delivered, to purchase for the stated consideration on the same terms and conditions the interest which the other party

---

1. The 1989 version of Form 610 is the most recent version of the Model Form Operating Agreement promulgated by the AAPL. *See* Terry I. Cross, *The Ties That Bind: Preemptive Rights and Restraints on Alienation that Commonly Burden Oil and Gas Properties*, 5 TEX. WESLEYAN L.REV. 193, 195–96 & nn. 2–4 (1999) (discussing history of preferential right provision in AAPL model form operating agreement and quoting the three different versions [1956, 1977, and 1989]); *see also* John R. Reeves, *The Development of the Model Form Operating Agreement: An Interpretive Accounting*, 54 OKLA. L.REV. 211, 278–82 (2001). The preferential right provision in the 1989 version does not vary appreciably from that contained in the first model operating agreement adopted by the AAPL in 1956, which read as follows:

> Should any party desire to sell all or any part of its interests under this contract, or its rights and interests in the Unit Area, it shall promptly give written notice to the other parties, with full information concerning its proposed sale, which shall include the name and address of the prospective purchaser (who must be ready, willing and able to purchase), the purchase price, and all other terms of the offer. The other parties shall then have an optional prior right, for a period of ten (10) days after receipt of the notice, to purchase on the same terms and conditions the interest which the other party proposes to sell; and, if this optional right is exercised, the purchasing parties shall share the purchased interest in the proportions that the interest of each bears to the total interest of all purchasing parties. However, there shall be no preferential right to purchase in those cases where any party wishes to mortgage its interests, or to dispose of its interests by merger, reorganization, consolidation, or sale of all of its assets, or a sale or transfer of its interests to a subsidiary or parent company, or subsidiary of a parent company, or to any company in which any one party owns a majority of the stock.

Cross, 5 TEX. WESLEYAN L.REV. at 195 n. 2.

proposes to sell; and, if this optional right is exercised, the purchasing parties shall share the purchased interest in the proportions that the interest of each bears to the total interest of all purchasing parties. However, there shall be no preferential right to purchase in those cases where any party wishes to mortgage its interests, or to transfer title to its interests to its mortgagee in lieu of or pursuant to foreclosure of a mortgage of its interests, or to dispose of its interests by merger, reorganization, consolidation, or by sale of all or substantially all of its Oil and Gas assets to any party, or by transfer of its interests to a subsidiary or parent company or to a subsidiary of a parent company, or to any company in which such party owns a majority of the stock.

In September 2005, Gastar Exploration, Ltd., the parent company of First Source, signed a letter of intent with "Chesapeake Energy Corporation and/or its affiliate Chesapeake Exploration Limited Partnership" with three primary components:

(1) Chesapeake would purchase 19.9 percent of Gastar's outstanding shares of common stock;

(2) Chesapeake would purchase 33.33 percent of First Source's working interest in the Hilltop Prospect, while First Source would retain 66.67 percent of its working interest; and

(3) Chesapeake and Gastar would enter an area of mutual interest (AMI) comprising thirteen counties in East Texas.

On October 18, First Source Vice President Henry J. Hansen mailed a letter to the attention of Mike Ellis, Vice President of Alta Mesa Resources, Inc. (Navasota's general partner), informing Navasota of the deal with Chesapeake. That letter reads as follows:

Gastar Exploration, Ltd., and its wholly owned subsidiary First Source Gas, L.P. (collectively called Gastar), have entered into a Letter of Intent (LOI) with Chesapeake Energy Corporation (Chesapeake) to sell a portion of its leasehold interest in the lands subject to the referenced Operating Agreement (Operating Agreement). A press release is enclosed that summarizes the LOI. Among other specifics, Chesapeake has agreed to purchase 1/3rd of Gastar's net leasehold acres in the subject lands at a cost of $700 per net acre. In addition, Chesapeake has agreed to pay 44.44% of the costs through casing point in the first 6 deep Bossier Test Wells, proposed by Gastar, to earn a 33.33% working interest, proportionately reduced to Gastar's interest. Currently Gastar owns 21,484 net acres in the subject lands. Chesapeake's net expenditure to acquire this leasehold will be $5,012,933 (21,484 net acres × $700 ×.3333).

Pursuant to Article VIII. F., of the Operating Agreement you have 10 days from the receipt of this notification to elect your preferential right to purchase. If you so elect you will be obligated to pay Gastar $5,012,933 for 1/3rd of Gastar's net leasehold acreage that is subject to the Operating Agreement. Further, you must elect to pay 44.44% of the costs through casing point in the first 6 deep Bossier Test Wells, proposed by Gastar, to earn a 33.33% working interest, proportionately reduced to Gastar's interest.

Although you have 10 days to make your decision, Gastar and Chesapeake plan to close on October 31, 2005. Therefore, your early election is requested and appreciated.

· Please make your election in the space provided below and fax your election to my attention at [telephone number].

Please return an original signed election to my attention by regular mail in the enclosed envelope.

Hansen attached a press release to this letter describing in more detail the tripartite agreement between Gastar and Chesapeake.

By letter dated October 21, Navasota notified First Source of its intent to exercise its preferential right. Navasota sent a copy of its election to the number indicated by facsimile at 2:53 p.m. and delivered the original via Federal Express.

Meanwhile, First Source sent a second letter dated October 21 advising Navasota that the October 18 "letter was erroneous." "Therefore First Source Gas, L.P. hereby rescinds said notice." Navasota received this letter by facsimile at about 5:00 p.m. on October 21.

Two days later, First Source sent by facsimile a second notice letter regarding the exercise of Navasota's preferential right. In this letter, First Source explained that Navasota must comply with every aspect of the tripartite agreement between Gastar and Chesapeake (i.e., (1) the stock purchase; (2) the net acreage purchase with additional drilling costs; and (3) entry into the 13–county AMI) if Navasota intended to exercise its preferential right. Navasota refused to accept First Source's "modified" offer and insisted that the parties had a binding contract based on Navasota's acceptance of the terms set forth in the October 18 notice letter. In response, Gastar acknowledged by letter dated October 28 that it had received Navasota's purported acceptance letter dated October 21 (on Monday morning, October 24) but insisted that "Gastar had every right to rescind the ambiguous

notice." Thus, Gastar refused to close the deal which Navasota sought. Instead, Gastar and Chesapeake closed on their agreement on November 4.

**The Litigation**

Navasota filed suit on October 31.[2] By its third amended petition, Navasota alleged claims for breach of contract, suit to quiet title, trespass to try title, tortious interference with contract, conversion, money had and received, and declaratory relief. In particular, Navasota sought (1) specific performance of its preferential right, (2) to quiet title to the Hilltop Prospect, and (3) damages. Gastar (and First Source as its subsidiary) generally denied Navasota's allegations and alleged several affirmative defenses. Chesapeake answered in similar fashion.

Chesapeake filed the first summary judgment motion.[3] Chesapeake alleged in this motion: (1) Navasota's preferential right under the joint operating agreement was not invoked by the Gastar–Chesapeake transaction; (2) if Navasota's preferential right was invoked, Navasota failed to accept the offer because it failed to accept all of the terms and conditions of the Gastar–Chesapeake agreement; and (3) if Navasota's acceptance was valid, the preferential right provision constitutes an unreasonable restraint on alienation.

Gastar moved for summary judgment on the ground that Navasota failed to properly exercise its preferential right because it failed to accept all of the terms and conditions of the Gastar–Chesapeake agreement.

Finally, Navasota moved for summary judgment on the grounds that: (1) Navasota properly exercised its preferential right;

---

**2.** Navasota also filed a *lis pendens* with respect to the Hilltop Prospect on October 31.

**3.** Chesapeake's motion was a traditional summary judgment motion, as were those filed subsequently by the other parties.

(2) First Source breached the preferential right provision of the joint operating agreement; (3) the October 18 notice letter created a binding option in Navasota's favor which First Source could not rescind; (4) First Source could not change the terms of the option created by the October 18 notice letter; (5) First Source cannot require Navasota to purchase shares of Gastar stock or enter the 13–county AMI to exercise its preferential right; and (6) Navasota is entitled to specific performance.

The trial court granted Gastar's and Chesapeake's summary judgment motions and denied Navasota's. The court did not specify the basis for its rulings.

### Standard of Review

We conduct a *de novo* review of a summary judgment. *Valence Operating Co. v. Dorsett,* 164 S.W.3d 656, 661 (Tex.2005). To prevail on a traditional summary judgment motion, the movant must demonstrate that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. *See Diversicare Gen. Partner, Inc. v. Rubio,* 185 S.W.3d 842, 846 (Tex.2005). "[W]e take as true all competent evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor." *Id.*

When competing motions for summary judgment are filed and some are granted while others denied, the general rule is that the appellate court should determine all questions presented and render the judgment the trial court should have rendered. *Tex. Workers' Comp. Comm'n v. Patient Advocates of Tex.,* 136 S.W.3d 643, 648 (Tex.2004); *Am. Hous. Found. v. Bra-*

*zos County Appraisal Dist.,* 166 S.W.3d 885, 887 (Tex.App.-Waco 2005, pet. denied). However, this rule applies only when both (or all) parties' motions sought a final judgment, namely, relief on all pending claims.[4] *See CU Lloyds of Tex. v. Feldman,* 977 S.W.2d 568, 569 (Tex.1998) (per curiam); *Am. Hous. Found.,* 166 S.W.3d at 887; *Krishnan v. Law Offices of Preston Henrichson, P.C.,* 83 S.W.3d 295, 303 (Tex.App.-Corpus Christi 2002, pet. denied).

When the parties file competing summary judgment motions but one side seeks a final judgment while the other seeks only a partial summary judgment, if the trial court renders a final judgment then the appellate court may review the propriety of the court's rulings on both motions. *See, e.g., CU Lloyd's of Tex.,* 977 S.W.2d at 569; *Bowman v. Lumberton Indep. Sch. Dist.,* 801 S.W.2d 883, 889 (Tex.1990). In this situation, if the motion for partial summary judgment includes a claim for declaratory relief, an appellate court may render judgment for declaratory relief on liability alone then remand the case to the trial court for further proceedings. *Id.*

### Preferential Rights in General

 Generally, a preferential right to purchase requires the owner of the subject property to offer the property first to the holder of the right on the same terms and conditions offered by a third party. *City of Brownsville v. Golden Spread Elec. Coop.,* 192 S.W.3d 876, 880 (Tex.App.-Dallas 2006, pet. denied); *McMillan v. Dooley,* 144 S.W.3d 159, 171 (Tex.App.-Eastland 2004, pet. denied); Gary B. Conine, *Property Provisions of the Operating Agreement—Interpretation, Validity, and*

---

4. By comparison, an appellate court may reverse and remand if resolution of the pertinent issues rests in disputed facts or if the parties' motions are premised on different grounds. *See Sarandos v. Blanton,* 25 S.W.3d 811, 814 & n. 5 (Tex.App.-Waco 2000, pet. denied).

*Enforceability*, 19 Tex. Tech. L.Rev. 1263, 1323 (1988). When the property owner gives notice of his intent to sell, the preferential right ripens or matures into to an enforceable option. *City of Brownsville*, 192 S.W.3d at 880; *Abraham Inv. Co. v. Payne Ranch, Inc.*, 968 S.W.2d 518, 524 (Tex.App.-Amarillo 1998, pet. denied); Conine, 19 Tex. Tech. L.Rev. at 1323. The terms of the option are formed by the provisions granting the preferential right to purchase and the terms and conditions of the third-party offer. *See City of Brownsville*, 192 S.W.3d at 880; *see also W. Tex. Transmission, L.P. v. Enron Corp.*, 907 F.2d 1554, 1565 (5th Cir.1990); *Fasken Land & Minerals, Ltd. v. Occidental Permian Ltd.*, 225 S.W.3d 577, 589 (Tex.App.-El Paso 2005, pet. denied); Conine, 19 Tex. Tech. L.Rev. at 1323. After the property owner gives the rightholder notice of his intent to sell, the terms of the option cannot be changed for as long as the option is binding on the property owner. *See City of Brownsville*, 192 S.W.3d at 880; *Abraham Inv. Co.*, 968 S.W.2d at 525; Conine, 19 Tex. Tech. L.Rev. at 1323.

█ The rightholder's exercise of the option must be unqualified, unambiguous, and strictly in accordance with the terms of the agreement. *See City of Brownsville*, 192 S.W.3d at 880; *Comeaux v. Suderman*, 93 S.W.3d 215, 220 (Tex.App.-Houston [14th Dist.] 2002, no pet.); Conine, 19 Tex. Tech. L.Rev. at 1323. The rightholder must accept all the terms of the offer, or the offer will be considered rejected. *See City of Brownsville*, 192 S.W.3d at 880; *see also Comeaux*, 93 S.W.3d at 220; Conine, 19 Tex. Tech. L.Rev. at 1323-24. When the rightholder gives notice of his intent to accept the offer and exercise his option, a binding contract is created between the rightholder and the property owner. *City of Brownsville*, 192 S.W.3d at 880; *Abraham Inv. Co.*, 968 S.W.2d at 525.

### Invocation of Preferential Right

█ Navasota contends in issue I(C) that the preferential right provision of the joint operating agreement was invoked notwithstanding that the Gastar–Chesapeake transaction was a "package deal" involving more properties than just the working interests which were the subject of the joint operating agreement.

According to the majority rule, a third party's offer to purchase property subject to a preferential right provision as part of a package deal involving multiple properties or a larger tract of land does not invoke the preferential right provision. *See Sawyer v. Firestone*, 513 A.2d 36, 39–40 (R.I.1986). The primary authority cited for this position is the decision of the Superior Court of New Jersey, Appellate Division, in *Guaclides v. Kruse*. 67 N.J.Super. 348, 170 A.2d 488, 493 (N.J.Super.Ct.App.Div.1961).[5] According to the court in *Guaclides*, "[a]n attempt to sell the whole may not be taken as a manifestation of an intention or desire on the part of the owner to sell the smaller optioned part so as to give the optionee the right to purchase the same." *Id.*

---

5. *See Aden v. Estate of Hathaway*, 162 Colo. 311, 427 P.2d 333, 334 (1967); *Myers v. Lovetinsky*, 189 N.W.2d 571, 575–77 (Iowa 1971); *Straley v. Osborne*, 262 Md. 514, 278 A.2d 64, 69–70 (1971); *Crow–Spieker # 23 v. Robert L. Helms Constr. & Dev. Co.*, 103 Nev. 1, 731 P.2d 348, 350 (1987) (per curiam); *Johnnies Pelham Rd. Serv., Inc. v. Thomas*, 26 A.D.3d 414, 809 N.Y.S.2d 561, 563 (N.Y.App.Div.2006); *Ollie v. Rainbolt*, 1983 OK 79, 669 P.2d 275, 279–81 (1983); *Sawyer v. Firestone*, 513 A.2d 36, 39–40 (R.I. 1986); *Smith v. Traxler*, 228 S.C. 418, 90 S.E.2d 482, 488 (1955); *see also In re New Era Resorts, LLC*, 238 B.R. 381, 386–87 (Bankr.E.D.Tenn.1999) (applying Tennessee law); *Manella v. Brown Co.*, 537 F.Supp. 1226, 1229 (D.Mass.1982) (applying Maine law).

Conversely, courts in other states have held that a preferential right is invoked by such package transactions. The most often cited decision for this position is that of the Michigan Supreme Court in *Brenner v. Duncan.* 318 Mich. 1, 27 N.W.2d 320, 322 (1947).[6] As an example of the reasoning for this line of cases, the Supreme Court of North Dakota explained:

> we conclude that an intention to sell a larger parcel of land, including a tract under lease to a tenant, is evidence of an intention to sell the leased premises, even where no separate apportionment of value is made by owner and purchaser. To conclude otherwise would permit an owner and prospective purchaser to, in effect, destroy a bargained-for purchase preemption before the expiration of the term for which such preemption was obtained.

*Berry–Iverson Co. of N.D. v. Johnson,* 242 N.W.2d 126, 134 (N.D.1976).

Courts in some states apparently differentiate between package transactions which include different (but sometimes related) properties and those which include a larger tract of land which the premises subject to the preferential right are located within. *Compare Boyd & Mahoney v. Chevron U.S.A.,* 419 Pa.Super. 24, 614 A.2d 1191, 1194–95 (1992) (specific performance awarded for multi-state, multi-asset transaction); *with L.E. Wallach, Inc. v. Toll,* 381 Pa. 423, 113 A.2d 258, 260–61 (1955) (preferential right not invoked by transaction involving three adjoining lots only one of which was subject to preferential right); *and Williams Gas Processing v. Union Pac. Res. Co.,* 2001 WY 57, 25 P.3d 1064, 1071–73 (2001) (specific performance awarded for multi-asset transaction); *with Chapman v. Mut. Life Ins. Co. of N.Y.,* 800 P.2d 1147, 1150–51 (Wyo.1990) (preferential right not invoked by transaction involving 273 acres of which 22.6 was subject to preferential right).[7]

Texas courts almost uniformly have followed the *Brenner* line of cases. *See*

---

6. *See Maron v. Howard,* 258 Cal.App.2d 473, 66 Cal.Rptr. 70, 79 (Cal.Ct.App.1968); *Denco, Inc. v. Belk,* 97 So.2d 261, 265 (Fla.1957); *N. Side Asphalt & Material Transp., Inc. v. Foreman,* 520 N.E.2d 457, 460 (Ind.Ct.App.1988); *Unlimited Equip. Lines, Inc. v. Graphic Arts Ctr., Inc.,* 889 S.W.2d 926, 935 (Mo.Ct.App. 1994); *Berry–Iverson Co. of N.D., Inc. v. Johnson,* 242 N.W.2d 126, 133–34 (N.D.1976); *Janas v. Simmons,* No. WD–86–60, 1987 WL 9903, at *2–3, app. at *10 (Ohio Ct.App.1987) (not designated for publication); *Landa v. Century 21 Simmons & Co.,* 237 Va. 374, 377 S.E.2d 416, 421 (1989); *Wilber Lime Prods., Inc. v. Ahrndt,* 268 Wis.2d 650, 673 N.W.2d 339, 343 (Wis.Ct.App.2003); *see also Pantry Pride Enters., Inc. v. Stop & Shop Cos.,* 806 F.2d 1227, 1229–31 (4th Cir.1986) (applying Virginia law).

7. Another body of cases exists under the federal Petroleum Marketing Practices Act and similar state laws. *See* 15 U.S.C.S. §§ 2801–2841 (LexisNexis 2005). The PMPA provides for a statutory right of first refusal for certain franchisees when a petroleum franchisor has received a bona fide offer for the franchisor's interest in the premises. *Id.* § 2802(b)(3)(D)(iii)(II). The decisions under the PMPA involving multi-asset transactions likewise vary as to whether a franchisee is entitled to specific performance. *See, e.g., Ellis v. Mobil Oil,* 969 F.2d 784, 785–86 (9th Cir.1992) (PMPA right of first refusal not invoked where Mobil negotiated deal exchanging eight Mobil stations for six Unocal stations); *Arnold v. Amoco Oil Co.,* 872 F.Supp. 1493, 1499 (W.D.Va.1995) (PMPA right of first refusal is invoked in multi-station transaction "[w]hen the valuation of individual properties is readily apparent and there is no evidence of unfair manipulation"); *Forty–Niner Truck Plaza, Inc. v. Union Oil Co. of Cal.,* 58 Cal.App.4th 1261, 68 Cal.Rptr.2d 532, 543 (Cal.Ct.App.1997) (applying *Arnold* rationale to California statute modeled after PMPA). We do not rely on these cases for our analysis because they involve the interpretation of statutory rights of first refusal and invoke statutory definitions not at issue here.

*McMillan,* 144 S.W.3d at 178–79 (preferential right provision of oil and gas lease invoked by transaction involved that lease and two others); *Riley v. Campeau Homes (Tex.), Inc.,* 808 S.W.2d 184, 188–89 (Tex.App.-Houston [14th Dist.] 1991, writ dism'd by agr.) (preferential right provision of condominium unit lease invoked by "bulk sale" of that unit and 24 others); *Foster v. Bullard,* 496 S.W.2d 724, 735–36 (Tex.Civ.App.-Austin 1973, writ ref'd n.r.e.) (preferential right provision for 48–acre tract invoked by sale of 2,487–acre ranch which included the smaller tract); *contra Hinds v. Madison,* 424 S.W.2d 61, 63–64 (Tex.Civ.App.-San Antonio 1967, writ ref'd n.r.e.) (sale of 14,800–acre ranch did not invoke lessee's preferential right under grazing lease for 2,800–acre portion of ranch).

Therefore, we hold that the Gaspar–Chesapeake proposal invoked Navasota's preferential right because the proposal included the sale of First Source's working interest in the net acreage subject to the joint operating agreement in addition to the sale of other assets. *See McMillan,* 144 S.W.3d at 178–79; *Riley,* 808 S.W.2d at 188–89; *Foster,* 496 S.W.2d at 735–36.

### Terms and Conditions

■ Navasota contends in issue I(A) that First Source cannot require Navasota to purchase the shares of Gastar common stock or enter the 13–county AMI to exercise its preferential right.

The preferential right provision states that a party which desires to exercise that right must agree to purchase the interest being sold "on the same terms and conditions" as a third party has agreed to purchase that interest. Gastar and Chesapeake argue that the stock purchase and entry into the 13–county AMI are additional "terms and conditions" for the purchase of the Hilltop Prospect working interest. Navasota responds that these are not "terms and conditions" of the Hilltop Prospect transaction but rather separate transactions included within the overall Gastar–Chesapeake deal.

The terms of the option are formed by the provisions granting the preferential right to purchase and the terms and conditions of the third-party offer. *See City of Brownsville,* 192 S.W.3d at 880; *see also W. Tex. Transmission,* 907 F.2d at 1565; *Fasken Land & Minerals,* 225 S.W.3d at 589; Conine, 19 TEX. TECH. L.REV. at 1323.

Virtually every authority of which we are aware agrees that the holder of a preferential right cannot be compelled to purchase assets beyond those included within the scope of the agreement subject to the preferential right in order to exercise that right. *See McMillan,* 144 S.W.3d at 179; *Comeaux,* 93 S.W.3d at 221 n. 2; *Hinds,* 424 S.W.2d at 64.[8] Gastar and Chesapeake refer to the Fifth Circuit's decision in *West Texas Transmission* in which the court cited numerous authorities regarding various "non-price conditions" which "courts have insisted that [preferential right holders] replicate" to enforce their preferential rights. 907 F.2d at 1564. In particular, Gastar and Chesapeake call attention to two of the authorities cited by the Fifth Circuit which the preferential right holders were required to replicate; (1) "additional partnership and land development obligations"; *Id.* (citing *Prince v. Elm Inv. Co.,* 649 P.2d 820, 823–26 (Utah 1982)); and (2) "the purchase of a larger quantity of land." *Id.* (citing *Crow–Spiek-*

---

**8.** *Accord Pantry Pride Enters.,* 806 F.2d at 1229; *Johnnies Pelham Rd. Serv.,* 809 N.Y.S.2d at 563; *L.E. Wallach, Inc. v. Toll,* 381 Pa. 423, 113 A.2d 258, 260 (1955); *Lan-* da, 377 S.E.2d at 421; *see also Straley,* 278 A.2d at 70 n. 8 (lessee cannot compel lessor to sell him larger tract); *Guaclides,* 170 A.2d at 493 (same).

er # 23 v. Robert L. Helms Constr. & Dev. Co., 103 Nev. 1, 731 P.2d 348, 350 (1987) (per curiam)).

West Texas Transmission and Prince are distinguishable from the facts of this case. The former involved Valero Transmission Company's [9] preferential right to repurchase a one-half interest in the TransTexas Natural Gas Pipeline if Enron Corporation [10] chose to sell it. Id. at 1556. Enron negotiated a deal to sell 100 percent of its stock in a subsidiary, including the pipeline interest, to TECO Pipeline Company. Id. at 1557. Because of the ongoing involvement of the Federal Trade Commission in these pipeline transactions and various mergers and acquisitions, Enron included FTC approval as a condition of the deal with TECO. Id. at 1556–57. Enron notified Valero of the deal, and Valero elected to exercise its preferential right by purchasing the stock being offered to TECO.[11] Id. at 1558. However, Valero informed Enron that it would not comply with the requirement that FTC approval be obtained. Id. at 1558–59. When the FTC rejected the proposed sale to Valero but ratified the proposed sale to TECO, Valero sought a temporary injunction in court, but after a trial on the merits, the federal district court rendered judgment in Enron's favor. Id. at 1559–61. The Fifth Circuit likewise rejected Valero's position, and held that Valero had to satisfy the condition of FTC approval because it was "commercially reasonable, imposed in good faith, and not specifically designed to defeat Valero's preemptive

rights." W. Tex. Transmission, 907 F.2d at 1563.

Thus, West Texas Transmission is distinguishable because it involved the conveyance of a single asset rather than a package deal involving multiple assets. See McMillan, 144 S.W.3d at 177. West Texas Transmission is also distinguishable because the condition at issue (FTC approval) directly related to the sale of the interest in the pipeline as opposed to some unrelated asset.

In Prince, the dispute centered on a single tract of land (subject to the plaintiff's preferential right) which the defendant contributed to a partnership as part of the consideration for acquiring an interest in the partnership. See Prince, 649 P.2d at 821. Thus, Prince is distinguishable for the same reason as West Texas Transmission.

With regard to Crow–Spieker, we first observe that the portion of the decision cited by the Fifth Circuit was the Nevada court's "alternative" holding. See Crow–Spieker, 731 P.2d at 350. Nevertheless, to the extent that this alternative holding supports Gastar's and Chesapeake's position, this holding is contrary to the greater weight of authority on this particular issue. See McMillan, 144 S.W.3d at 179; Comeaux, 93 S.W.3d at 221 n. 2; Hinds, 424 S.W.2d at 64; accord Pantry Pride Enters., Inc. v. Stop & Shop Cos., 806 F.2d 1227, 1229 (4th Cir.1986); Johnnies Pelham Rd. Serv., Inc. v. Thomas, 26 A.D.3d 414, 809 N.Y.S.2d 561, 563 (N.Y.App.Div. 2006); L.E. Wallach, 113 A.2d at 260;

9. Valero Transmission Company was a predecessor in interest to West Texas Transmission, L.P. See W. Tex. Transmission, L.P. v. Enron Corp., 907 F.2d 1554, 1556 (5th Cir.1990).

10. Enron was a successor in interest to NorTex, the entity with which Valero executed the agreement containing the preferential right provision. Id.

11. This was actually the second notification from Enron because the first attempted sale to Valero failed on its own terms when FTC approval was not received by the date specified in the parties' purchase agreement. Id. at 1557–58.

*Landa v. Century 21 Simmons & Co.,* 237 Va. 374, 377 S.E.2d 416, 421 (1989); *see also Straley v. Osborne,* 262 Md. 514, 278 A.2d 64, 70 n. 8 (1971); *Guaclides,* 170 A.2d at 493.

Therefore, we hold as a matter of law that First Source could not require Navasota to purchase the shares of Gastar common stock or enter the 13–county AMI to exercise its preferential right.

### Notice to Navasota

Navasota contends in issues I(B) and II(A) that First Source's October 18 notice and Navasota's response created a binding contract for Navasota's purchase of 33.33 percent of the working interest First Source held in the Hilltop Prospect.

First Source apparently recognized that Navasota's preferential right had been invoked because it notified Navasota on October 18 that Navasota had ten days to decide whether to exercise this right. Specifically, First Source advised Navasota that it must pay $5,012,933 for the working interest which First Source was offering to Chesapeake and 44.44 percent of the drilling costs "through casing point in the first 6 deep Bossier Test Wells." Navasota responded within the time period specified that it intended to exercise its preferential right by satisfying these two requirements.

However, First Source sought to rescind its initial notice and include as additional terms and conditions the purchase of Gastar stock and entry into the 13–county AMI. *But see City of Brownsville,* 192 S.W.3d at 880 ("the terms of the option cannot be changed for as long as the option is binding on the property owner"); *Abraham Inv. Co.,* 968 S.W.2d at 525 (same). As we have already determined, these were not conditions which First Source could require Navasota to satisfy to exercise its preferential right.

Therefore, when Navasota notified First Source of its acceptance of the two terms and conditions initially specified for the purchase of 33.33 percent of First Source's working interest in the Hilltop Prospect, a binding contract for sale was created. *Id.*

### Unreasonable Restraint on Alienation

■ Navasota contends in issue I(D) that the preferential right provision does not place an unreasonable restraint on alienation. Gastar and Chesapeake both cite the Restatement of Property and Texas cases relying on the Restatement as establishing the principles applied in Texas with regard to restraints on alienation. They contend that under these principles Navasota's preferential right constitutes an unreasonable restraint on alienation.

Gastar and Chesapeake are correct that Texas courts have looked to the Restatement to determine issues regarding alleged restraints on alienation. *See, e.g., Sonny Arnold, Inc. v. Sentry Sav. Ass'n,* 633 S.W.2d 811, 813–15 (Tex.1982) (citing RESTATEMENT OF PROP. § 404 (1944)); *Reagan Nat'l Adver. of Austin, Inc. v. Capital Outdoors, Inc.,* 96 S.W.3d 490, 494 (Tex. App.-Austin 2002, pet. denied) (same); *Randolph v. Terrell,* 768 S.W.2d 736, 738–39 & nn. 1, 3 (Tex.App.-Tyler 1987, writ denied) (citing RESTATEMENT (SECOND) OF PROP.: DONATIVE TRANSFERS § § 3.1–3.4, 4.2(3), 4.4 (1983)); *Perritt Co. v. Mitchell,* 663 S.W.2d 696, 698 (Tex.App.-Fort Worth 1983, writ ref'd n.r.e.) (citing RESTATEMENT OF PROP. § 413 (1944)). We shall do so as well.

Section 404 of the Restatement defines a restraint on alienation in part as "an attempt by an otherwise effective conveyance or contract to cause a later conveyance ... to impose contractual liability on the one who makes the later conveyance when such liability results from a breach of an agreement not to convey; or ... to

terminate or subject to termination all or part of the property interest conveyed." RESTATEMENT OF PROP. § 404(1)(b), (c). The Restatement specifically defines the sort of preferential right sought to be enforced by Navasota as a "promissory restraint" on alienation. *Id.* § 413(1) & cmt. a; *see Perritt Co.*, 663 S.W.2d at 698.

The provisions of the original Restatement regarding restraints on alienation have been significantly reworked in the Restatement (Third) but with little apparent effect on the result in this case.[12] Section 3.1(3) provides that a "servitude"[13] is invalid as violative of public policy of it "imposes an unreasonable restraint on alienation under § 3.4 or § 3.5." RESTATEMENT (THIRD) OF PROP.: SERVITUDES § 3.1(3) (2000). Section 3.4 provides:

A servitude that imposes a direct restraint on alienation of the burdened estate is invalid if the restraint is unreasonable. Reasonableness is determined by weighing the utility of the restraint against the injurious consequences of enforcing the restraint.

*Id.* § 3.4 (2004). Comment f then directly addresses the type of preferential right which Navasota seeks to enforce.

If the right to purchase is on the same terms and conditions as the owner may receive from a third party, if the procedures for exercising the right are clear, and if the period within which it must be exercised is relatively short, the right of first refusal is valid unless the purpose is not legitimate. Since the practical effect of the restraint on alienability is minimal, duration of the first-refusal right should not affect validity.

*Id.* cmt. f; *accord* RESTATEMENT OF PROP. § 413 cmt. c.[14]

Consistent with the Restatement, Texas courts have without exception upheld provisions like the one at issue here as reasonable restraints on alienation. *See Perritt Co.*, 663 S.W.2d at 698–99; *Forderhause v. Cherokee Water Co.*, 623 S.W.2d 435, 438–39 (Tex.Civ.App.-Texarkana 1981), *rev'd on other grounds*, 641 S.W.2d 522 (Tex.1982); *see also* John R. Reeves, *The Development of the Model Form Operating Agreement: An Interpretive Accounting*, 54 OKLA. L.REV. 211, 280–81 (2001); Harlan Abright, Comment, *Preferential Right Provisions and*

---

**12.** The Restatement (Second) of Property also addresses restraints on alienation but in the context of donative transfers, not commercial transactions. *See Procter v. Foxmeyer Drug Co.*, 884 S.W.2d 853, 858 (Tex.App.-Dallas 1994, no writ).

**13.** Section 1.1 of the Restatement (Third) of Property defines a "servitude" as follows:

(1) A servitude is a legal device that creates a right or an obligation that runs with land or an interest in land.
(a) Running with land means that the right or obligation passes automatically to successive owners or occupiers of the land or the interest in land with which the right or obligation runs.
(b) A right that runs with land is called a "benefit" and the interest in land with which it runs may be called the "benefited" or "dominant" estate.

(c) An obligation that runs with land is called a "burden" and the interest in land with which it runs may be called the "burdened" or "servient" estate.
RESTATEMENT (THIRD) OF PROP.: SERVITUDES § 1.1(1) (2000).

**14.** Section 413, comment c provides:

The interference with alienation present in a requirement that a designated person be afforded a reasonable opportunity to meet any offer received from a third person by an owner desirous of selling is so slight that the major policies furthered by freedom of alienation are not infringed to a degree which requires invalidation. Under these circumstances, the owner has two potential buyers at the same price and is assured of a reasonably prompt culmination of the sale.
RESTATEMENT OF PROP. § 413 cmt. c (1944).

*Their Applicability to Oil and Gas Instruments*, 32 Sw. L.J. 803, 807–08 (1978); Harry M. Reasoner, *Preferential Purchase Rights in Oil and Gas Instruments*, 46 Tex. L.Rev. 57, 60–65 (1967). This position is likewise consistent with that taken by most other jurisdictions.[15]

Accordingly, we hold that the preferential right provision at issue does not constitute an unreasonable restraint on alienation.

## Mutual or Unilateral Mistake, Unconscionability

■ Navasota contends in issue II(D) that Gastar's and Chesapeake's defenses of mutual mistake and unilateral mistake and Gastar's related claim of unconscionability fail as a matter of law.

■ A party relying on the affirmative defense of mutual mistake must establish "what the parties' true agreement was and that the instrument incorrectly reflects that agreement because of a mutual mistake." *Atl. Lloyds Ins. Co. v. Butler*, 137 S.W.3d 199, 213 (Tex.App.-Houston [1st Dist.] 2004, pet. denied); *accord N. Nat. Gas Co. v. Chisos Joint Venture I*,

142 S.W.3d 447, 456 (Tex.App.-El Paso 2004, no pet.). For unilateral mistake, a party must establish among other things[16] that "the mistake is of so great a consequence that to enforce the contract would be unconscionable." *Ledig v. Duke Energy Corp.*, 193 S.W.3d 167, 175 (Tex.App.-Houston [1st Dist.] 2006, no pet.); *N. Nat. Gas Co.*, 142 S.W.3d at 456. A "unilateral mistake by one party, combined with knowledge of that mistake by the other party, is equivalent to mutual mistake." *Atl. Lloyds Ins. Co.*, 137 S.W.3d at 213.

The key to mutual or unilateral mistake is the existence of an actual *mistake* on the part of one or both parties to a contract. Here, Gastar's and Chesapeake's claim of mistake hinges on their presupposition that they may be held to the terms of the October 18 notice letter because of Navasota's acceptance of those terms, even if those terms were not correctly stated.

However, we have already determined that, under the terms of the Gastar–Chesapeake transaction and the language of the preferential right provision in the joint operating agreement, the only terms and conditions which Navasota had to meet were the $700–per–net–acre price and the

15. *See Cambridge Co. v. E. Slope Inv. Corp.*, 700 P.2d 537, 541–43 (Colo.1985); *Hinson v. Roberts*, 256 Ga. 396, 349 S.E.2d 454, 456 (1986); *Meridian Bowling Lanes, Inc. v. Meridian Athletic Ass'n*, 105 Idaho 509, 670 P.2d 1294, 1296–97 (1983); *Drayson v. Wolff*, 277 Ill.App.3d 975, 214 Ill.Dec. 632, 661 N.E.2d 486, 491–93 (1996); *Terrell v. Messenger*, 428 So.2d 1241, 1244–45 (La.Ct.App.1983); *Bortolotti v. Hayden*, 449 Mass. 193, 866 N.E.2d 882, 890–91 (2007); *Stenke v. Masland Dev. Co.*, 152 Mich.App. 562, 394 N.W.2d 418, 421–22 (1986); *Murphy Exploration & Prod. Co. v. Sun Operating Ltd. P'ship*, 747 So.2d 260, 262–63 (Miss.1999); *Lorentzen v. Smith*, 129 N.M. 278, 5 P.3d 1082, 1086–87 (N.M.Ct. App.2000); *Metro. Transp. Auth. v. Bruken Realty Corp.*, 67 N.Y.2d 156, 501 N.Y.S.2d 306, 492 N.E.2d 379, 385 (1986); *Smith v. Mitchell*, 301 N.C. 58, 269 S.E.2d 608, 613 (1980); *Robroy Land Co. v. Prather*, 95 Wash.2d 66, 622 P.2d 367, 369–71 (1980); *see also Iglehart v. Phillips*, 383 So.2d 610, 614 (Fla.1980) ("option restraint is reasonable if the option price is at market or appraised value, irrespective of the duration of the option").

16. The other elements for a claim of unilateral mistake are: "(2) the mistake relates to a material feature of the contract; (3) the mistake occurred despite ordinary care; and (4) the parties can be placed in status quo, *i.e.*, the rescission must not prejudice the other party except for the loss of the bargain." *Ledig v. Duke Energy Corp.*, 193 S.W.3d 167, 175 (Tex.App.-Houston [1st Dist.] 2006, no pet.); *N. Nat. Gas Co. v. Chisos Joint Venture I*, 142 S.W.3d 447, 456 (Tex.App.-El Paso 2004, no pet.).

additional drilling expenses. The October 18 notice letter accurately stated these two terms and conditions, and Navasota accepted them. Therefore, Gastar's and Chesapeake's claims of mutual or unilateral mistake must fail.

Gastar also argued in its response to Navasota's summary judgment motion that it would be unconscionable to enforce the parties' agreement for $700 per net acre. Gastar cites two cases for the proposition that a mistake in a contract may render enforcement of the contract unconscionable even though the contract is otherwise enforceable. *See Florsheim Co. v. Miller*, 575 F.Supp. 84, 84–85 (E.D.Tex.1983) ($1 million mistake in construction bid); *B.D. Holt Co. v. OCE, Inc.*, 971 S.W.2d 618, 620 (Tex.App.-San Antonio 1998, pet. denied) ($100,000 mistake). Gastar's argument in this regard is based on circular logic and not a separate claim of procedural or substantive unconscionability. *See, e.g., In re Palm Harbor Homes, Inc.*, 195 S.W.3d 672, 677 (Tex.2006) (orig.proceeding). The cited cases by Gastar both address "unconscionability" in terms of the first element of a claim of unilateral mistake, *i.e.*, "the mistake is of so great a consequence that to enforce the contract would be *unconscionable.*" *See Florsheim Co.*, 575 F.Supp. at 85; *B.D. Holt Co.*, 971 S.W.2d at 620; *see also Ledig*, 193 S.W.3d at 175 (listing elements for unilateral mistake); *N. Nat. Gas Co.*, 142 S.W.3d at 456 (same).

We have already determined that there was no mistake. Therefore, there logically could be no mistake which rendered enforcement of the preferential right provision unconscionable.

### Breach of Contract

■ Navasota contends in issue II(B) that First Source breached the parties' contract by failing to honor the preferential right provision.

■ To establish a breach-of-contract claim, a plaintiff must show: (1) a valid contract; (2) the plaintiff performed or tendered performance; (3) the defendant breached the contract; and (4) the plaintiff suffered damages as a result of the breach. *Critchfield v. Smith*, 151 S.W.3d 225, 233 (Tex.App.-Tyler 2004, pet. denied); *Runge v. Raytheon E–Sys., Inc.*, 57 S.W.3d 562, 565 (Tex.App.-Waco 2001, no pet.).

Here, when Navasota notified First Source of its acceptance of the two terms and conditions initially specified for the purchase of 33.33 percent of First Source's working interest in the Hilltop Prospect, a valid contract for sale was created. *See City of Brownsville*, 192 S.W.3d at 880; *Abraham Inv. Co.*, 968 S.W.2d at 525. Navasota tendered performance of these two terms and conditions, but First Source refused to honor the contract. Navasota suffered damages because of First Source's breach because it was not allowed to exercise its bargained-for preferential right and was denied ownership of the disputed working interest which First Source instead conveyed to Chesapeake.

Accordingly, Navasota conclusively established that First Source breached the parties' contract.

### Specific Performance

■ Navasota contends in issue II(C) that it is entitled to specific performance because of First Source's breach. Gastar and Chesapeake respond that Navasota is not entitled to specific performance because a genuine issue of material fact remains concerning the "true value" of the working interest which Navasota seeks to obtain.

Gastar and Chesapeake contend that "the value of the Hilltop Prospect is substantially higher that that reflected in the letter of intent." According to them, this

higher value was accounted for by the other terms of the Gastar–Chesapeake transaction (*i.e.*, the stock purchase and the 13–county AMI).

Several courts in other jurisdictions agree with Gastar's and Chesapeake's position. This line of cases is perhaps best encapsulated by the opinion of the Fourth Circuit in *Pantry Pride Enterprises, Inc. v. Stop & Shop Cos.* 806 F.2d 1227 (4th Cir.1986). As that court observed:

> allocations of price to elements of a package may readily be manipulated *to defeat* contractual rights of first refusal. It is easy to imagine an unreasonably inflated value assigned to the subject of any first-refusal option. In such a case, courts would recognize what is apparent here: that the value assigned to the separate elements of a deal may have little meaning and that the value of the total package alone reflects arms-length negotiations and a fair market price.

*Id.* at 1231–32.

*Pantry Pride* involved a $9.8 million acquisition of twenty grocery stores (all of which were apparently located on leased premises) along with the equipment in those stores. In the agreement, the total purchase price was allocated among the twenty stores and a further allocation was made with respect to each store so that 75 percent of the purchase price was allocated to the equipment and 25 percent to the lease. *Id.* at 1228. The dispute in this particular case involved one store for which the allocated price was $571,000 ($428,500 for equipment and $142,750 for the lease). *Id.*

The owner of the shopping center (Stop & Shop) sought to exercise its right of first refusal for $142,750. The Fourth Circuit affirmed the district court's decision that Stop & Shop was entitled to specific performance. *Id.* at 1229–31. However, it rejected Stop & Shop's contention that

Pantry Pride should be made to assign the lease for the allocated price of $142,750. *Id.* at 1231–32.

Having rejected the artificial value, one could determine the offering price for the leasehold either by reallocating the total $9.8 million purchase price or by dividing the $571,000 purchase price between the lease and equipment according to their respective values.

The first approach has significant practical problems because it would require the district court to allocate the $9.8 million to the twenty different leases and the various equipment bought by Richmond. Further, use of the $9.8 million figure is inappropriate because, as Pantry Pride agrees, Richmond offered to buy the Norfolk store for $571,000. In its February 1985 notice to Stop & Shop, Pantry Pride stated that the terms and conditions of the Richmond offer were the purchase of the entire supermarket for $571,000. Because the $571,000 figure represents the price offered by Richmond for the lease and equipment, the task is to determine what portion of this purchase price was for the leasehold.

On remand, the parties should submit to the district court evidence of the value of the entire supermarket at the time of the offer and evidence of what percentage of that value was fairly attributable to the lease. Once this percentage is determined, it should be applied to the $571,000 offering price to ascertain what percentage of the offering price was offered for the lease. Under this approach, Stop & Shop may still receive a windfall, since the $571,000 purchase price for the Norfolk store in question may have been lowered in order to consummate the complete twenty-store transaction. Any windfall to Stop & Shop in this instance, however, is bal-

anced by the benefits to Pantry Pride from the form that the transaction took.

We believe that this course strikes an equitable balance between the value of Stop & Shop's contractual option, the need to facilitate transactions in commercial real estate, and the need to present upon remand a problem of manageable proportions to the district court. As the option holder, Stop & Shop may always refuse the offering price established in the remand proceedings. Our holding also leaves parties free to structure future first-refusal options in any way they like. Only where a contract fails to speak plainly to the circumstances, may courts attempt to construe the parties' true intent.

*Id.* at 1232.

Some courts have agreed with this approach. *See Gleason v. Norwest Mortgage, Inc.,* 243 F.3d 130, 142–43 (3d Cir. 2001); *Wilber Lime Prods., Inc. v. Ahrndt,* 268 Wis.2d 650, 673 N.W.2d 339, 342–43 (Wis.Ct.App.2003); *Shell Oil Co. v. Trailer & Truck Repair Co.,* 828 F.2d 205, 208–10 (3d Cir.1987).

Other courts have held that the seller should be held to the allocated price absent affirmative evidence of bad faith or of some other improper basis for the allocated price. *See In re Adelphia Communications Corp.,* 368 B.R. 348, 356–58 (Bankr. S.D.N.Y.2007); *Park Plaza, Ltd. v. Pietz,* 193 Cal.App.3d 1414, 239 Cal.Rptr. 51, 54–55 (Cal.Ct.App.1987); *Uno Rests., Inc. v. Boston Kenmore Realty Corp.,* 441 Mass. 376, 805 N.E.2d 957, 962–64 (2004); *Unlimited Equip. Lines, Inc. v. Graphic Arts Ctr., Inc.,* 889 S.W.2d 926, 939 (Mo.Ct.App. 1994); *Berry–Iverson Co.,* 242 N.W.2d at 134–36; *Samson Res. Co. v. Amerada Hess Corp.,* 2002 OK CIV APP 32, 41 P.3d

1055, 1059 (2001); *Boyd & Mahoney,* 614 A.2d at 1195; *Rappaport v. Banfield,* 2007 VT 25, 924 A.2d 72, 78–80 (2007).

The California Court of Appeal seemed to best summarize this line of cases by the following observation, "To reject the allocation concept because of possible abuse, where actual abuse can be adjudicated and defused, is to throw out the baby with the bath water." *Park Plaza,* 239 Cal.Rptr. at 55.

The only Texas decisions which have addressed valuation appear to follow this approach. In *Riley,* a condominium lessee's preferential right was invoked by the lessor's sale of the condominium building for a price of $76.20 per square foot. *See Riley,* 808 S.W.2d at 185, 188. The court held that the lessee was entitled to exercise his preferential right at that same price. *Id.* at 187–88. However, *Riley* is arguably different from the case at bar because the condominium units under consideration in that case were presumably of relatively equal value, while in the present case we are concerned with a multi-part transaction involving distinct assets.

Somewhat closer to the facts of this case are those presented in *Foster.* There, Foster held a right of first refusal on an approximately 48–acre tract of land adjoining a 30–acre tract which he already owned. *See Foster v. Bullard,* 554 S.W.2d 66, 67 (Tex.Civ.App.-Austin 1977, writ ref'd n.r.e.).[17] Bullard sold the 48–acre tract as part of a 2,487–acre ranch for $650 per acre. *Id.* at 67–69. Because Foster's contract required him to pay an amount "consistent with [a third party's] offer" "but not less than $750.00 per acre" to exercise his right of first refusal, Foster sought to exercise his right of first refusal for the

---

**17.** This was actually the second appeal in *Foster. See Foster v. Bullard,* 496 S.W.2d 724

(Tex.Civ.App.-Austin 1973, writ ref'd n.r.e.).

48–acre tract at $750 per acre. *Id.* at 66–67. Bullard argued, however, that the 48–acre tract was actually worth $3,000 per acre. In fact, Bullard had notified Foster that he must pay $3,000 per acre to exercise his right of first refusal. *Id.* at 68. In addition to this notice, the other evidence relied on by Bullard was: (1) he had previously negotiated with a potential buyer to sell the 48–acre tract as part of a 164–acre tract for $3,000–$3,500 per acre; and (2) the potential buyer and he had operated under a mistaken assumption that this tract of land had frontage on Barton Creek. *Id.* at 67.

The Austin court held that Foster was entitled to exercise his right of first refusal at $750 per acre. *Id.* at 71. The court observed that Bullard's prior negotiations were superseded by the actual terms agreed to in the contract and that there was no evidence in the record to support Bullard's contention that the eventual purchaser assigned a higher per acre value to the 48–acre tract than to the remainder of the acreage. *Id.*

The only summary judgment evidence in the record regarding the assigned price of $700 per net acre is found in Gastar's response to Navasota's summary judgment motion. In an affidavit attached to this response, Gastar president and CEO Russell Porter stated that this per acre price "did not reflect the true value of the acreage and was discounted as a result of the other terms, namely the stock purchase and the AMI commitment." Porter likewise stated:

> If Gastar had decided to negotiate and enter a contract for the sale of a portion of its leasehold working interest in the Hilltop Prospect without the consideration supplied by the other two principal terms (the stock purchase and AMI), Gastar would not have agreed to sell such leasehold interest for $700 per

acre. On the contrary, the true value of such acreage is substantially higher, and this higher value was accounted for by the other two terms of the Letter of Intent.

Gastar and Chesapeake argue that awarding specific performance to Navasota at $700 per net acre will result in Navasota being permitted to exercise its preferential right with regard to the Hilltop Prospect by paying less than the "true value" of First Source's working interest. While this may be correct, the preferential right provision agreed to by the parties does not require the preferential right holder to pay "true value" or fair market value. Rather, the preferential right provision requires only that the holder match the third-party offer.

Finally, we observe that Navasota is entitled to obtain specific performance from Chesapeake because Chesapeake stands in the shoes of First Source as a purchaser with notice of Navasota's preferential right. *Abraham Inv. Co.*, 968 S.W.2d at 527.

Accordingly, we hold that Navasota conclusively established its entitlement to specific performance of its preferential right by payment of $5,012,933 (21,484 net acres × $700 per net acre × .3333 interest) and 44.44 percent of the costs through casing point in the first 6 deep Bossier Test Wells in the Hilltop Prospect.

## Conclusion

Navasota established its entitlement to judgment as a matter of law on its claims for breach of contract and for declaratory relief in the form of specific performance. Navasota requests in its prayer for relief that this Court: (1) reverse and render "on its claims for breach of contract and declaratory judgment" and (2) reverse and remand "for the limited purpose of determining Navasota's recoverable attorney's

fees and costs and any amount of revenues owed to Navasota for the period of time since Navasota exercised its preferential right." Because Navasota sought only a partial summary judgment,[18] we will reverse the judgment of the trial court, render judgment in Navasota's favor on its claims for breach of contract and specific performance, and remand this cause to the trial court for further proceedings consistent with this opinion.

Chief Justice GRAY not participating.

---

**18.** Navasota's third amended petition alleged claims for breach of contract, suit to quiet title, trespass to try title, tortious interference with contract, conversion, money had and received, and declaratory relief. Navasota's summary judgment motion, however, alleged an entitlement to judgment on only its claims for breach of contract and for declaratory relief in the form of specific performance. Thus, Navasota's summary judgment motion sought only a partial summary judgment. *See CU Lloyd's of Tex. v. Feldman*, 977 S.W.2d 568, 569 (Tex.1998) (per curiam); *Bowman v. Lumberton Indep. Sch. Dist.*, 801 S.W.2d 883, 889 (Tex.1990).