COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

 

                                        NO.
2-08-321-CV

 

 

FWT, INC.                                                                          APPELLANT

 

                                                   V.

 

HASKIN WALLACE MASON                                                     APPELLEE

PROPERTY MANAGEMENT,
L.L.P.

 

                                              ------------

 

            FROM
THE 96TH DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                OPINION ON REHEARING

 

                                              ------------

Appellant
FWT, Inc. filed a motion for rehearing and en banc reconsideration of our
opinion issued on August 27, 2009.  We
deny FWT=s motion
for rehearing and en banc reconsideration, withdraw our opinion and judgment
dated August 27, 2009, and substitute the following.

I.  Introduction








Texas
law is clear that a right of first refusal empowers its holder with a
preferential right to purchase the subject property on the same terms offered
by or to a bona fide purchaser.  Tenneco
Inc. v. Enter. Prods. Co., 925 S.W.2d 640, 644 (Tex. 1996).  What is less clear is whether the holder of a
preferential right who desires to exercise that right can be required under
certain circumstances to purchase assets that are bundled with the subject
property.  This is the primary issue at
the center of a dispute between FWT and Appellee Haskin Wallace Mason Property
Management, L.L.P. (AHaskin Wallace@).  We will affirm the trial court=s orders
denying FWT=s motion for summary judgment,
granting Haskin Wallace=s motion for summary judgment,
and overruling FWT=s objections and special
exceptions to Haskin Wallace=s motion
for summary judgment and response.

II.  Undisputed Factual and Procedural Background

Greg
Haskin, Russell Wallace, and Jim Mason are the owners of Haskin Wallace.  In 1990, they formed Texas Galvanizing,
Inc.  Texas Galvanizing is located in
Hurst and operates a Ahot-dip@
galvanizing plant.[1]








In 1997,
FWT sold to Haskin Wallace approximately six acres of undeveloped real property
(Athe
Property@)
located in Kennedale and adjacent to FWT=s
plant.  A Correction Warranty Deed (ADeed@)
identifies FWT as the AGrantor@ and
Haskin Wallace as the AGrantee@;
identifies the Property as that described in an exhibit attached to the Deed,
which is a metes and bounds description of the six acres; and includes the
following right of first refusal in favor of FWT:

(a)     In the event Grantee desires to sell, lease
or otherwise convey all or any part of the Property and shall have a bona fide
offer from a third party who is ready, willing and able to purchase the
Property at a price acceptable to Grantee, then Grantee shall furnish to
Grantor written notice of the name of the prospective purchaser and the terms
and conditions of such offer.  Such
notice shall be deemed to have been served and received, when mailed in the
United States mail, postage prepaid, by certified mail, return receipt
requested, addressed to Grantor at the following address:

 

FWT, Inc.

P.O. Box 8597

Fort Worth, Tarrant County, Texas  76124

 

Grantor shall have 20 days after receipt of the notice in which to
elect to purchase, lease or otherwise accept such conveyance, as the case may
be, at the same price and under the same terms and conditions offered by the
prospective purchaser.  Such election shall be
exercised by written notice given by Grantor to Grantee. [Emphasis added.]

 

Haskin,
Wallace, and Mason created U.S. Galvanizing, L.P. to operate and manage a
galvanizing business to be located on the Property.  A 22,500-square-foot facility designed for Ahot-dip@
galvanizing was constructed on the Property, and U.S. Galvanizing commenced
operations in December 1998.








Haskin,
Wallace, and Mason eventually decided to sell Texas Galvanizing and U.S.
Galvanizing.  FWT proposed to purchase
the businesses for $15.5 million, but Haskin, Wallace, and Mason ultimately
reached an agreement with Valmont Industries, Inc. for the sale of the
businesses and for the lease or purchase of the Property.  By letter dated December 17, 2007, Haskin
Wallace notified FWT that Valmont had agreed to purchase the assets of both
galvanizing businesses for $16,500,000; to lease the Property from Haskin
Wallace for $25,000 per month for five years with two additional five-year
options and an option to purchase the Property for $2,500,000; and to sublease
from Haskin Wallace the property on which Texas Galvanizing was located.  Valmont did not offer to purchase the assets
of the businesses independent of the lease or purchase of the Property.  According to the December 17 letter, the
purchase of one Abundle of assets is contingent
upon the purchase of another.@

In
response to the notification letter, FWT sent a letter dated December 31, 2007,
to Haskin Wallace stating as follows:

This letter is to advise you that FWT, Inc. hereby elects to exercise
its right of first refusal in the Deed.

 








Apparently under the impression
that FWT desired to exercise its preferential right and purchase the
galvanizing businesses under the same terms and conditions as Valmont, counsel
for Haskin Wallace responded to FWT=s December
31 letter and forwarded to FWT=s
counsel a AClosing Checklist@ and a
proposed closing date of January 22, 2008. 
The checklist identified the ASellers@ as
Texas Galvanizing, U.S. Galvanizing, Haskin, Wallace, and Mason, and it listed
the due dates and responsible party for various documents or items relevant to the
sale of Texas Galvanizing and U.S. Galvanizing.

Thereafter,
by letter dated January 8, 2008, FWT notified Haskin Wallace of the following:

By letter dated December 31, 2007, I advised you that FWT, Inc. had
elected to exercise its right of first refusal in the Deed.  FWT, Inc. is ready to consummate the closing
of the exercise of the right of first refusal in the Deed.  Please advise me of the closing date.

 

In response to this letter,
counsel for Haskin Wallace sent a letter to FWT=s
counsel stating in part that Athe
exercise of the Option to Purchase by a holder of a Right of First Refusal must
be positive, unconditional and unequivocal and must be exercised in strict
compliance with the terms of the option@ and
that AFWT must
accept all terms of the offer or the offer will be considered rejected.@  Counsel for Haskin Wallace thus proposed
January 18, 2008, as a closing date and stated that his clients would expect to
receive good funds totaling $16,500,000 for the assets of Texas Galvanizing and
U.S. Galvanizing.  No closing ever
occurred.








Haskin
Wallace sued FWT shortly thereafter, seeking a declaratory judgment that FWT=s right
of first refusal was extinguished or that FWT failed to materially comply with
the right of first refusal and, therefore, waived the right.  FWT answered and sought a declaration in its
amended counterclaim that the right of first refusal contained in the Deed Apertains
solely to the sale or lease of the Property@; that
FWT properly exercised its right of first refusal in the Deed; and that FWT may
lease the Property at a rate of $25,000 per month for five years, elect to
renew the lease under the same terms for two additional five-year terms, and
elect to purchase the Property for $2,500,000. 
FWT also sought specific performance of its right of first refusal in
the Deed and pleaded that all conditions precedent to recovery on its claim for
specific performance had been performed or have occurred.








Haskin Wallace
filed a motion for summary judgment on its declaratory judgment action, citing
two grounds:  (1) FWT=s right
of first refusal was waived or extinguished because FWT failed to tender
performance in conformity with the terms and conditions of the ATransaction,@ and (2)
in order to appropriately exercise the right of first refusal, FWT was required
to unequivocally accept all of the terms and conditions of the ATransaction.@  Haskin Wallace identified the ATransaction@ as
Valmont=s
acquisition of the assets of Texas Galvanizing and U.S. Galvanizing.  FWT responded and specially excepted to parts
of Haskin Wallace=s motion.  FWT also filed a motion for summary judgment,
asserting that summary judgment was proper on its claim for a declaratory
judgment because it properly exercised its right of first refusal in the Deed,
which related solely to the Property, and that summary judgment was proper on
its claim for specific performance. 
Haskin Wallace responded, to which FWT filed special exceptions and objections.  The trial court denied FWT=s motion
for summary judgment, granted Haskin Wallace=s motion
for summary judgment, and overruled FWT=s
objections and special exceptions.  FWT appeals.

III.  Standard of Review

In a
summary judgment case, the issue on appeal is whether the movant met the
summary judgment burden by establishing that no genuine issue of material fact
exists and that the movant is entitled to judgment as a matter of law.  Tex. R. Civ. P. 166a(c); Sw. Elec. Power
Co. v. Grant, 73 S.W.3d 211, 215 (Tex. 2002); City of Houston v. Clear
Creek Basin Auth., 589 S.W.2d 671, 678 (Tex. 1979).  The burden of proof is on the movant, and all
doubts about the existence of a genuine issue of material fact are resolved
against the movant.  Sw. Elec. Power
Co., 73 S.W.3d at 215.








When
reviewing a summary judgment, we take as true all evidence favorable to the
nonmovant, and we indulge every reasonable inference and resolve any doubts in
the nonmovant=s favor.  Valence Operating Co. v. Dorsett, 164
S.W.3d 656, 661 (Tex. 2005).  Evidence
that favors the movant=s position will not be
considered unless it is uncontroverted.  Great
Am. Reserve Ins. Co. v. San Antonio Plumbing Supply Co., 391 S.W.2d 41, 47
(Tex. 1965).  But we must consider
whether reasonable and fair-minded jurors could differ in their conclusions in
light of all of the evidence presented.  See
Wal-Mart Stores, Inc. v. Spates, 186 S.W.3d 566, 568 (Tex. 2006); City
of Keller v. Wilson, 168 S.W.3d 802, 822B24 (Tex.
2005).  The summary judgment will be
affirmed only if the record establishes that the movant has conclusively proved
all essential elements of the movant=s cause
of action or defense as a matter of law. 
Clear Creek Basin Auth., 589 S.W.2d at 678.

When
both parties move for summary judgment and the trial court grants one motion
and denies the other, the reviewing court should review both parties= summary
judgment evidence and determine all questions presented.  Valence Operating Co., 164 S.W.3d at
661.  The reviewing court should render
the judgment that the trial court should have rendered.  Id.

IV.  Conditions Precedent








In its
first issue, FWT argues that Haskin Wallace=s
failure to specifically deny the occurrence of conditions precedent to specific
performance bars it from claiming that its preferential right was not triggered
or that it waived the preferential right.[2]  FWT raises this argument for the first time
on appeal.  Accordingly, the argument is
waived.  See Tex. R. Civ. P.
166a(c) (AIssues not expressly presented
to the trial court by written motion, answer or other response shall not be
considered on appeal as grounds for reversal.@); Tex.
R. App. P. 33.1 (requiring that as a prerequisite for presenting a complaint
for appellate review, record must show that the complaint was made to trial
court by timely request, objection, or motion). 
We overrule FWT=s first issue.

V.  FWT=s Preferential Right








In its
second issue, FWT challenges the trial court=s order
denying its motion for summary judgment on its claims for a declaratory
judgment and for specific performance. 
FWT contends that its preferential right requires it to meet only the
terms offered by Valmont with regard to the Property and that it is therefore
not obligated to additionally purchase the assets of the galvanizing
businesses.  It relies on a number of
Texas intermediate appellate court cases that purport to support its position.  FWT claims that Texas case law Aoverwhelmingly@
supports its position, that Aevery
Texas case considering whether a right of first refusal obligates its holder to
purchase more than the property subject to the right [of first refusal] has
rejected [Haskin Wallace=s] position,@ and
that the case law Haskin Wallace relies on is distinguishable from the facts of
this case.

Haskin
Wallace argues that the language in the Deed establishing FWT=s
preferential right required FWT to match the same terms and conditions offered
by Valmont, including purchasing the assets of the galvanizing businesses,
because the terms were commercially reasonable, imposed in good faith, and not
designed to defeat FWT=s preferential right.  Haskin Wallace relies principally on a case
from the Fifth Circuit Court of Appeals[3]
and a number of Texas intermediate appellate court cases applying the rule
expressed in the Fifth Circuit case.  It
contends that the cases relied on by FWT are distinguishable and thus not
controlling.








There is
no dispute that FWT has a valid preferential right as set forth in the Deed,
that Haskin Wallace gave notice of the terms and conditions of Valmont=s offer
as required by the Deed, that FWT=s
preferential right was triggered,[4]
or that FWT gave timely notice of its desire to exercise its preferential
right.  Nor is there any dispute or
contention by either party that the language in the Deed setting forth FWT=s
preferential right is ambiguous.  Rather,
the dispute between FWT and Haskin Wallace only concerns whether, in exercising
its preferential right, FWT must either (a) only lease or purchase the
Property under the same terms and conditions offered by Valmont without
also purchasing the assets of Texas Galvanizing and U.S. Galvanizing or
(b) lease or purchase the Property under the same terms and conditions
offered by Valmont and also purchase the assets of Texas Galvanizing and
U.S. Galvanizing.

A.     Preferential Rights in
General








A
preferential right, also known as a right of first refusal or preemptive right,
is a right granted to a party giving him or her the first opportunity to
purchase property if the owner decides to sell it.  Mandell v. Mandell, 214 S.W.3d 682,
688 (Tex. App.CHouston [14th Dist.] 2007, no
pet.); Holland v. Fleming, 728 S.W.2d 820, 822B23 (Tex.
App.CHouston
[1st Dist.] 1987, writ ref=d
n.r.e.).  A preferential right has been
described as a dormant option.  Mandell,
214 S.W.3d at 688 (citing A.G.E., Inc. v. Buford, 105 S.W.3d 667, 673
(Tex. App.CAustin 2003, pet. denied)).  Once the property owner conveys the terms of
the offer to the rightholder, the rightholder then has the power to accept or
reject the offer.  Abraham Inv. Co. v.
Payne Ranch, Inc., 968 S.W.2d 518, 524 (Tex. App.CAmarillo
1998, pet. denied).  Thus, when the
property owner gives notice of his intent to sell, the preferential right
matures or Aripens@ into an
enforceable option.  City of
Brownsville v. Golden Spread Elec. Coop., Inc., 192 S.W.3d 876, 880
(Tex. App.CDallas 2006, pet. denied).

The
terms of the option are formed by both the provisions granting the preferential
right and the terms and conditions of the third-party offer presented to the
rightholder.  Id.; Abraham Inv.
Co., 968 S.W.2d at 524B25.  Once the property owner has given the
rightholder notice of his intent to sell on the terms contained in the
third-party offer, the terms of the option cannot be changed for as long as the
option is binding on the property owner. 
Golden Spread Elec. Coop., 192 S.W.3d at 880.








The
rightholder=s exercise of the option to
purchase must be positive, unconditional, and unequivocal.  Id.; Tex. State Optical, Inc. v.
Wiggins, 882 S.W.2d 8, 10B11 (Tex.
App.CHouston
[1st Dist.] 1994, no writ).  With regard
to an option, generally, a purported acceptance containing a new demand, proposal,
condition, or modification of the terms of the offer is not an acceptance but a
rejection.  Golden Spread Elec. Coop.,
192 S.W.3d at 880; Tex. State Optical, 882 S.W.2d at 11.  When the rightholder gives notice of his
acceptance of the offer, a contract between the rightholder and the property
owner is created.  Golden Spread Elec.
Coop., 192 S.W.3d at 880.

B.     Contract Construction

Our
primary concern when construing a written contract is to ascertain the true
intentions of the parties as expressed in the instrument.  Coker v. Coker, 650 S.W.2d 391, 393
(Tex. 1983).  We examine and consider the
entire writing in an effort to harmonize and give effect to all provisions of
the contract so that none will be rendered meaningless.  Id. 
We presume that the parties to the contract intend every clause to have
some effect.  Heritage Res., Inc. v.
NationsBank, 939 S.W.2d 118, 121 (Tex. 1996); XCO Prod. Co. v. Jamison,
194 S.W.3d 622, 627 (Tex. App.CHouston
[14th Dist.] 2006, pet. denied).  We give
terms their plain, ordinary, and generally accepted meaning unless the contract
shows that the parties used them in a technical or different sense.  Heritage Res., 939 S.W.2d at 121.








C.     FWT=s Case
Law

FWT
relies on five Texas cases to support its argument that it is not obligated to
purchase the assets of the galvanizing businesses.  We examine each case.[5]

1.     Hinds
v. Madison[6]

 








The
Madisons owned a 14,818.63-acre tract of land. 
Hinds, 424 S.W.2d at 62. 
Out of that tract, they leased to Hinds 2,849.28 acres for a term of
five years, beginning October 1, 1962, and ending October 1, 1967.  Id. 
The leased tract was separated from the rest of the acreage by the Devil=s
River.  Id.  The lease provided that it was subject to the
Madisons= right
to sell the leased premises, and it gave the Madisons the right to terminate
the lease on October 1 of any year by giving to Hinds six months= prior
written notice of the sale.  Id.  The lease contained a preferential right in
favor of Hinds, stating in part that Ain the
event of sale, lessee shall have a preference right to purchase the leased
premises for such price and upon the same terms and conditions otherwise for
which lessors are willing to sell to others.@  Id. 
In December 1966, the Madisons entered into a contract with a third
party for the sale of the entire 14,818-acre tract.  Id. 
The sale, however, was never consummated.  Hinds sued seeking a declaration of when he
could exercise the preferential right contained in the lease.  Id. 
The trial court denied Hinds all relief. 
Id.

On
appeal, after analyzing a number of other points of error, the court considered
Hinds=s
argument that, according to the testimony at trial, he had a preferential right
to purchase the entire 14,818-acre tract for the same price and under
the same terms and conditions provided in the contract of sale between the
Madisons and the third party.  Id.
at 64.  FWT directs our attention to the Hinds
court=s lone statement addressing this
argument in which the court reasoned that it did not see Ahow in
any way lessee=s option or preference right to
purchase a portion of the property sought to be sold can be enlarged to cover
other lands owned by lessors, or can in any manner cover anything except the
property actually subject to the option.@  Id. 
The court cited the holding of one out-of-state case to support its
conclusion.  See Atl. Ref. Co. v. Wyo.
Nat=l Bank of Wilkes-Barre, 51
A.2d 719, 722B24 (Pa. 1947) (holding that a
lease of a portion of a parcel of land giving the lessee a preferential right
to purchase the demised premises on the same terms of an offer by a third
person does not give the lessee a right to purchase the whole parcel).








Hinds is the
first Texas case that we have located relevant to the specific issue addressed
here.  There are a couple of observations
worth pointing out.  Hinds argued in
points of error two through eight that the trial court had erred by not
declaring that he had a preferential right to purchase only the leased
premises for a price proportionate to what the Madisons had contracted to sell
the entire tract of land for.  Hinds,
424 S.W.2d at 63.  Notwithstanding the
money, this argument is somewhat similar to FWT=s
position in this case.  The Hinds
court, however, noted that there was Ano
evidence that lessors desired to or would sell the 2,849-acre tract alone,
without selling the whole tract.@  Id. at 63 (emphasis added).  This portion of the opinion appears to
support Haskin Wallace=s position in this case.  After concluding that Hinds was not entitled
to purchase only the leased tract of land for a particular sum of money, the
court went on to state, as set out above, that Hinds could not purchase the
entire 14,818-acre tract of land.  The
court=s
reasoning seems to be contradictory to a certain extent, but the portion of the
opinion relied on by FWT provides support for its position that the holder of a
preferential right cannot be compelled to purchase assets beyond the scope of
the agreement subject to the preferential right in order to exercise that
right.








2.     Riley v. Campeau Homes
(Tex.), Inc.[7]

The
Rileys were assigned a lease for condominium unit 1801 at the Bayou Bend Towers
from BTI, Ltd., who had leased the premises from Centeq Condominium, Ltd., who
later conveyed the property to Campeau.  Riley,
808 S.W.2d at 185.  The Rileys= lease
included a preferential right providing that the tenant would have the right to
purchase the property if the landlord received a bona fide offer to purchase in
whole or in part the leased premises.  Id.
at 186.  Campeau entered into a sales
contract with Advocate Equities (U.S.) Inc., Trustee for the sale of the Bayou
Bend Towers, including unit 1801, and the Rileys notified Campeau that they
desired to exercise their preferential right to purchase their condominium
unit.  Id. at 185.  Campeau subsequently advised the Rileys that
their unit was part of a larger sale of numerous properties and that it had no
intention to sell it other than as part of the entire transaction with
Advocate.  Id.  The Rileys demanded that their preferential
right to purchase the unit be honored, but Campeau refused the demand, Aasserting
that [the Rileys=] right of first refusal was not
applicable to this sale because it was a >bulk= sale
involving other properties.@  Id. 
The Rileys sued, and the trial court granted Campeau=s motion
for partial summary judgment.  Id.
at 186.








On
appeal, the court identified the specific issue to be resolved at the outset of
the opinion, stating as follows:  AThe
material issue in this case is whether a lessee=s right
of first refusal on a leased condominium is triggered when the owner decides to
sell that condominium as part of a package with other condominium units.@  Id. at 185.  The court held that the Rileys=
preferential right to purchase unit 1801 was triggered even though the single
unit was included as part of a Apackage@ deal to
purchase all of the Bayou Bend Towers units. 
Id. at 189.

Riley is
distinguishable from this case because the issue thereCwhether
the preferential right was triggeredCis not
at issue in this case; it is undisputed that the December 17, 2007 notification
letter triggered FWT=s preferential right.[8]  Riley is also distinguishable from
this case because Campeau ultimately withdrew the Rileys=
condominium unit from the sale of the remaining condominium units.  Id. at 186.  As Haskin Wallace points out, in this case,
the terms and conditions of Valmont=s offer
contemplate an Aall or nothing@
proposal.  Because Riley did not
present the specific issue that we are confronted with in this case, it is
inapposite.








3.     Comeaux v. Suderman[9]








Comeaux
leased from the Sudermans slightly less than one acre of land on the Bolivar
Peninsula in Galveston County.  Comeaux,
93 S.W.3d at 217.  The lease included a
preferential right in favor of Comeaux providing that in the event the
Sudermans received a proposal to sell the leased premises, the sale was subject
to Comeaux=s preferential right to purchase
the property on the same terms and conditions as those offered by the
prospective purchaser.  Id.  The Sudermans subsequently notified Comeaux
in writing of a pending $350,000 cash offer for the leased premises and some
adjoining property to the east and west of the leased premises.  Id. 
The notice did not specify that the total acreage to be sold was
thirty-five acres.  Id.  Comeaux, however, apparently assumed that the
sale involved only twenty-two acres surrounding his property.  Id. at 218.  He told the Sudermans= real
estate agent that he could not afford the $350,000 payment, and he continued
making payments to the new owners of the land, the Meiers, after the sale was
consummated.  Id.  Although Comeaux abandoned the leased
premises when a storm destroyed his fishing pier, he later sued the Sudermans
and the Meiers, asserting that he was entitled to specific performance or
damages because the Sudermans had failed to comply with the terms of the
preferential right contained in the lease agreement.  Id. 
The trial court granted summary judgment in favor of the Sudermans.  Id.

On
appeal, Comeaux argued that his preferential right was never triggered because
the written notice he received had failed to offer him the opportunity to
purchase only the leased premises (rather than the entire thirty-five-acre
parcel) and because the notice did not contain all the relevant terms and
conditions of the sale.  Id. at
219, 221.  The court disagreed and held
that Comeaux=s option had expired because he
received actual notice of the proposed sale of the leased premises and an
opportunity to purchase it, which he declined. 
Id. at 221B23.  The court stated that Abecause
Comeaux received notice and was given the opportunity to exercise his right of
first refusal, technical deficiencies in the noticeCor even
no noticeCcannot revive the right he
declined.@ 
Id. at 222.  FWT does not
rely on this, the holding of the case. 
Instead, it directs our attention to footnote three, in which the court
addressed the appellees= argument that they were not
required to give any notice to Comeaux because the sale was for more than the
leased premises.  Id. at 221
n.3.  The court acknowledged that it was Aunnecessary
to the disposition of [the] case@ to
address this issue, but it cited Riley and stated, AA seller
who has given a holder a preemptive right cannot defeat that right by selling
the subject matter of that right as part of a larger transaction.@  Id.








Comeaux is
distinguishable from this case because the issues thereCwhether
the preferential right was triggered and whether Comeaux made any effort to
exercise his option following his receipt of the notice of the proposed saleCare not
relevant to the issue in this case.[10]  The court also expressly noted that its
statement in footnote three was unnecessary to the disposition of the
case.  Id.  The dicta statement therefore does not
support FWT=s position.  Because Comeaux did not consider the
specific issue that we are confronted with in this case, it is inapposite.[11]

4.     McMillan v. Dooley








McDonald
or an entity under his control owned and operated three leases from the
mid-1970s until January 1998.  McMillan,
144 S.W.3d at 165.  The assignments by
which McDonald acquired the properties were subject to farmout agreements that
contained preferential rights in favor of the assignors.  Id. at 164B65.  In 1997, McMillan expressed interest in
purchasing the Dooley Lease, one of the three leases.  Id. at 165.  McDonald advised McMillan that he was
interested only in selling all of the leases as a package rather than just
selling the Dooley Lease by itself.  Id.  McDonald thereafter conveyed all of the
leases to McMillan without advising the preferential rightholders of McMillan=s
offer.  Id. at 166.  Dooley later informed McMillan of Dooley=s
preferential right as to the Dooley Lease, and McMillan offered to sell all of
the leases to Dooley, not just the Dooley Lease.  Id. 
But Dooley declined the offer because he was interested in purchasing
only the Dooley Lease.  Id. at
167.  Dooley and the other preferential
rightholders eventually sued McMillan after further correspondence.  Id. at 166B68.  The trial court determined that the
preferential right provisions had been breached, and it granted Dooley=s
request for specific performance, awarding him title to the Dooley Lease.  Id. at 169.








On
appeal, the court considered many issues, including whether McMillan had
adequately provided (or Apresented@) Dooley
with an opportunity to exercise his preferential right, whether Dooley was
required to accept the other leases in order to exercise his preferential
right, and whether Dooley=s preferential right expired
when he declined McMillan=s offer without taking any
further action.  Id. at 176B81.  In regard to whether Dooley was required to
accept the other leases in order to exercise his preferential right, the issue
most relevant to the issue in this case, the court acknowledged that A[o]nly a
few Texas cases have addressed the enforcement of preferential purchase rights
in a package conveyance,@ and it discussed only Hinds
and agreed with its reasoning.  Id.
at 179.  The court stated,

Assuming the defendants had only offered Dooley the opportunity to
purchase the Dooley Lease, the court=s holding in Hinds would have prevented
him from seeking to exercise his preferential purchase right against the other
leases in the conveyance.  If a
rightholder is not permitted to expand his preferential purchase right to
include property not covered by the provision, it would be improper for him to
be required to accept other property not covered by his preferential right in
order to exercise his right.

 

Id.[12]

There
are a number of ways in which the facts of McMillan are distinguishable
from this case.  Most notably, the
package deal that McMillan offered Dooley consisted of three unrelated
leases.  In this case, the business
assets and property that FWT has been offered to purchase are significantly
related; Haskin, Wallace, and Mason formed and own both Texas Galvanizing and
U.S. Galvanizing, and U.S. Galvanizing sits directly on top of the
Property.  Moreover, in McMillan,
there were two other rightholders making claims with regard to the other two
leases that McDonald included in his offer to Dooley.  In this case, there are no other competing
rightholders, persons, or entities.








5.     Navasota Res., L.P. v. First Source
Tex., Inc.[13]

Navasota
had a joint operating agreement with First Source applicable to certain oil and
gas interests in an area near the Navasota River.  Navasota, 249 S.W.3d at 529.  The parties referred to the property as the AHilltop
Prospect.@ 
Id.  Navasota owned an
undivided fifty-five percent working interest, and First Source owned an
undivided forty-five percent working interest. 
Id.  The agreement also
contained a preferential right provision requiring that notice be given to the
other party should a party desire to sell all or any part of its interest under
the agreement and providing that the party would have ten days to purchase the
interest under the same terms and conditions offered by the seller.  Id.








Gastar,
the parent company of First Source, signed a letter of intent with Chesapeake
in which (a) Chesapeake would purchase 19.9 percent of Gastar=s outstanding
stock, (b) Chesapeake would purchase 33.33 percent of First Source=s
working interest in the Hilltop Prospect, and (c) Chesapeake and Gastar
would enter an area of mutual interest comprising thirteen counties in East
Texas.  Id. at 530.  First Source notified Navasota of the deal
with Chesapeake and informed Navasota that if it elected to exercise its
preferential right, it would be obligated to pay Gastar for one-third of its
leasehold acreage in the Hilltop Interest and a percentage of drilling
costs.  Id.  This notice did not require Navasota to
purchase Gastar=s stock or enter into the
multi-county area of interest.  Navasota
timely notified First Source of its intent to exercise its preferential right,
but First Source sent a second notice letter explaining that Navasota had to
comply with every aspect of the agreement with Chesapeake, including
additionally purchasing the stock and entering into the thirteen-county area of
mutual interest.  Id. at 531.  Navasota refused to accept the modified
offer, Gastar claimed that it had the right to rescind the initial Aambiguous
notice,@ Gastar
refused to close the deal with Navasota, and Gastar and Chesapeake closed their
agreement.  Id.  Navasota sued, and the trial court granted
Gastar=s and
Chesapeake=s motions for summary judgment.  Id. at 531B32.








Among
numerous other issues addressed on appeal, the court considered whether First
Source could require Navasota to purchase the shares of Gastar stock and to
enter into the thirteen-county area of mutual interest.  Id. at 535B37.  The court stated, AVirtually
every authority of which we are aware agrees that the holder of a preferential
right cannot be compelled to purchase assets beyond those included within the
scope of the agreement subject to the preferential right in order to exercise
that right.@ 
Id. at 535.  In support of
this statement, it cited McMillan, Comeaux, and Hinds.  Id. 
The court distinguished West Texas Transmission and a few
cases cited therein and held that First Source could not require Navasota to
purchase the shares of Gastar stock or enter the thirteen-county area of mutual
interest.  Id. at 536B37.

Navasota, like McMillan,
arrived at its holding on this issue by relying on Hinds.  Also, like in McMillan, the assets
that First Source demanded that Navasota additionally acquire were unrelated to
the asset the subject of the joint operating agreement and preferential
right.  Id. at 530.  Further, the court did not indicate that West
Texas Transmission was entirely inapplicable or irrelevant to the issue;
the court merely distinguished it.

D.     Haskin Wallace=s Case
Law

Haskin
Wallace relies on West Texas Transmission and a few Texas cases to
support its argument that FWT must purchase the assets of the galvanizing
businesses in addition to leasing or purchasing the Property.  As we did with the authorities relied on by
FWT, we examine each case.

1.     West Texas Transmission








Valero,
the predecessor of West Texas Transmission, L.P., had a preferential right to
repurchase its interest in a pipeline if Enron decided to sell its interest in
the line.  W. Tex. Transmission,
907 F.2d at 1556.  Enron thereafter
negotiated a deal to sell all of its stock in NorTex, an affiliate, including
its interest in the pipeline, to TECO Pipeline Company.  Id. at 1557.  The agreement expressly conditioned
consummation of the sale on the approval of the Federal Trade Commission.  Id. 
Valero chose to exercise its preferential right to repurchase Enron=s
pipeline interest, but it declined to agree to the condition that the FTC
approve the purchase.  Id. at
1558.  The FTC ultimately disapproved of
Enron=s sale
to Valero and ratified the sale to TECO. 
Id. at 1559B60.  Valero sued and obtained a temporary
injunction, but the trial court rendered judgment in favor of Enron.  Id. at 1561.








On
appeal, the court stated that the agreement between Enron and Valero Aexplicitly
allows Valero to reacquire the pipeline >on the
same terms and conditions as set forth in [a third-party] offer or agreement to
purchase.=@  Id. at 1562B63.  The court reasoned that under that language, A[T]he
terms and conditions governing Valero=s
repurchase remain indeterminate until Enron receives an acceptable offer from a
third party.@ 
Id. at 1563.  The court
explained that under language similar to that used in the agreement between
Enron and Valero, A[T]he owner of property subject
to a right of first refusal remains master of the conditions under which he
will relinquish his interest, as long as those conditions are commercially
reasonable, imposed in good faith, and not specifically designed to defeat the
preemptive rights.@ 
Id.  Consequently, Awhere
the owner meets these three standards, the holder of the right of first refusal
lacks grounds to remove the specific conditions from the contract, or to
extract other concessions as part of the agreement.@  Id. 
The court held that Valero had to satisfy the condition of FTC approval
because it was commercially reasonable, imposed in good faith, and not specifically
designed to defeat Valero=s preferential right.[14]  Id. at 1567B68.

As the
court in Navasota recognized, West Texas Transmission involved
the conveyance of a single asset instead of multiple assets.  Navasota, 249 S.W.3d at 536.  However, we do not believe that this renders
the case inapplicable to ours.  The issue
addressed by the court in West Texas Transmission concerned whether the
holder of a preferential right must accept additional conditions included in a
third party=s offer.  That is the same issue we consider in this
appeal.  The condition in West Texas
Transmission was FTC approval; the condition in this case is the
acquisition of business assets.

2.     Texas State Optical








Texas
State Optical had an agreement with Dr. Kernek in which Dr. Kernek purchased a
retail store for the sale of eyewear and, among other things, a professional
optometry practice.  Tex. State
Optical, 882 S.W.2d at 9.  Texas
State Optical retained a preferential right to purchase Dr. Kernek=s
businesses if Dr. Kernek received an offer from a third party to purchase the
businesses.  Id.  After Dr. Kernek=s death,
his wife entered into a stock sale agreement for Wiggins to purchase the stock
of the businesses, and Texas State Optical notified her that it desired to
exercise its preferential right to purchase the businesses.  Id. at 10.  Texas State Optical, however, reserved the
right to dispute whether certain clauses of the agreement between Mrs. Kernek
and Wiggins were commercially reasonable, imposed in good faith, and designed
to defeat its preferential right.  Id.  These clauses included a provision giving a
buyer=s
commission to Wiggins and a provision giving one-year employment contracts to
certain employees.  Id.  Texas State Optical and Wiggins both filed
declaratory judgments to determine the parties=
obligations with respect to the disputed conditions of the sale, and Wiggins
prevailed.  Id.








On
appeal, the court reasoned that with regard to the exercise of an option, the
general rule is that the acceptance must be unequivocal; a purported acceptance
containing a new demand is a rejection.  Id.
at 10B11.  The court recognized, however, that it is an
exception to the general rule if a seller imposes a term in bad faith to defeat
the option.  Id. at 11.  It discussed the West Texas Transmission case
and held that the trial court had abused its discretion because it did not Areach
the issue of whether the disputed clauses were commercially unreasonable, or
were included in bad faith to defeat [Texas State Optical=s] right
of first refusal.@ 
Id.  Significantly, the
court stated, AWe agree with the Fifth Circuit=s
conclusions in West Texas Transmission.@[15]  Id. at 11.

3.     Shell v. Austin
Rehearsal Complex, Inc.[16]

Austin
Rehearsal Complex (AARC@) leased
space in a building that ultimately came into the ownership of the Shells.  Shell, 1998 WL 476728, at *1.  The governing agreement contained a
preferential right in favor of ARC requiring the Shells to notify ARC of a bona
fide offer to lease other space in the same building in which ARC leased space
and giving ARC the right to lease the property. 
Id. at *1 n.1.  After the
Shells sent ARC notice regarding a space for lease, ARC claimed that the Shells
refused to lease the space to them after it had exercised its preferential
right.  Id. at *2.  The Shells contended that ARC did not
effectively exercise its option because its acceptance of the notice was conditional;
ARC reserved the right to have a court determine the legality of the APermitted
Use@ and ATerms
and Conditions@ of the offer.  Id. at *2, 9.  ARC sued, and a jury returned a verdict in
its favor.  Id.








On
appeal, the Shells challenged the sufficiency of the evidence to support the
jury=s
affirmative answer to jury question number one: 
ADo you
find that each of the terms or conditions of the [notice of offer]
(a) were imposed in bad faith, or (b) were not commercially
reasonable, or (c) were reasonably designed to defeat ARC=s right
of first refusal?@ 
Id. at *7.  The court
detailed the same option rules addressed in Texas State Optical and
cited the exception set out in West Texas Transmission.  Id. at *9.  The court stated,

The Shells assert that we should not adopt this exception to the
general rule because the Fifth Circuit [in West Texas Transmission] and
Houston Court of Appeals [in Texas State Optical] did not follow Texas
law but rather created new law.  We
disagree.  Texas courts have long
recognized that the failure of the optionee to strictly comply with the terms
or conditions of the option contract may be excused when such failure is
brought about by the conduct of the optionor. 
We believe the exception stated in Texas State Optical is
reasonable and applicable to the present case.

 

Id.
(citations omitted).  The court thus
applied West Texas Transmission, and it held that the evidence was
sufficient to support the jury=s answer
to question number one.  Id. at
*10.

E.     The Clear and Unambiguous Language of the
Deed is Dispositive








Our
review of the case law leads us to conclude that, as a general rule, the holder
of a preferential right cannot be compelled to purchase assets beyond the scope
of the agreement subject to the preferential right in order to exercise that
right.  See Navasota, 249 S.W.3d
at 535; Hinds, 424 S.W.2d at 64. 
An exception to this rule exists, however, when the preferential right
is expressly made subject to the same terms and conditions offered by a
prospective, bona fide, third-party purchaser, as is the case here.  In such a case, the question of whether the
holder of a preferential right must purchase the additional assets turns on
whether the condition that requires the purchase of additional assets is
commercially reasonable, imposed in good faith, and not specifically designed to
defeat the preferential right.[17]  See W. Tex. Transmission, 907
F.2d at 1563.  While this exception has
been applied to cases involving the conveyance of a single asset, we have not
been shown any reason why it should not apply equally to cases involving
multiple assets.








In this
case, FWT elected to exercise its preferential right contained in the
Deed.  The Deed=s
preferential right provision clearly and unambiguously requires that FWT meet
the same price and the Asame terms and conditions
offered by the prospective purchaser,@
Valmont.  Valmont expressly
conditioned its purchase or lease of the Property on its acquisition of the
assets of the galvanizing businesses; the December 17 notification letter
provided to FWT states in part, AThe
Transaction, as contemplated by the parties, is contingent in nature and the
relevant components are not mutually exclusive, meaning that the purchase of
one bundle of assets is contingent upon the purchase of another, and all are
contingent on the whole.@ 
Thus, FWT was required to meet the terms and conditions of Valmont=s offer,
including the conditions requiring acquisition of the business assets, unless
those conditions were not commercially reasonable, were imposed in bad faith,
or were specifically designed to defeat FWT=s
preferential right.  See id.








Haskin
Wallace=s
summary judgment evidence included the December 17 notification letter.  The letter reveals that FWT itself at one
point in time contemplated Aan
acquisition of all or a majority of the assets that now comprise the
Transaction.@[18]  Also, in negotiating the details of the
transaction, Valmont and Haskin Wallace proceeded (for over four months) under
the impression that FWT=s waiver of its preferential
right was a Aforegone conclusion.@  Thus, FWT=s
possible exercise of its preferential right likely played little or no part at
all in Valmont=s decision to condition its
purchase or lease of the Property on its acquisition of the assets of the
galvanizing businesses.  This is
supported by examining the values attributed to the major parts of the
transaction.  The December 17 letter
identifies the total value of the transaction as $19,000,000, which includes a
purchase price of $12,606,000 for the assets of U.S. Galvanizing, a purchase
price of $3,894,000 for Texas Galvanizing=s
assets, and a purchase price of $2,500,000 for the option on the Property.  A large percentage of the total value of the
transaction accordingly consists of the purchase price for the assets of U.S.
Galvanizing and Texas Galvanizing, not the Property.  Because the value of the option to purchase
the Property is but a minor part of the overall value of the transaction (approximately
7.6%), it indisputably would have been both commercially and financially
unreasonable for Valmont to condition its purchase or lease of the Property on
its acquisition of the assets of the galvanizing businesses simply to frustrate
FWT=s
preferential right in the Property.  We
hold that Haskin Wallace met its summary judgment burden to show that Valmont=s
conditioning its purchase or lease of the Property on its acquisition of the
assets of the galvanizing businesses was commercially reasonable, imposed in
good faith, and not specifically designed to defeat FWT=s
preferential right.








FWT
makes no argument and points to no evidence that the parts of Valmont=s offer
conditioning its lease or purchase of the Property on its acquisition of the
galvanizing business assets were commercially unreasonable, were imposed in bad
faith, or were designed to defeat FWT=s
preferential right.

FWT
argues on rehearing that this court has Are-written
the parties= agreement for them.@  We disagree. 
FWT accepted the risk that it is now confronted with in this case
because it agreed to language in the Deed allowing a third party to dictate the
terms and conditions under which it would purchase or lease the Property.  The parties= intent
as expressed in the Deed would be circumvented if FWT is not required to
purchase the bundled assets.

FWT was
not entitled to judgment as a matter of law on its claims for a declaratory judgment
and for specific performance.  Haskin
Wallace was entitled to judgment as a matter of law on its declaratory judgment
action.  We overrule FWT=s second
issue.

VI.  FWT=s Objections and Special Exceptions








In its
third issue, FWT argues that the trial court abused its discretion by
overruling its objections and special exceptions to Haskin Wallace=s
summary judgment motion and response. 
FWT complains about a number of statements in Haskin Wallace=s motion
and response that allegedly attempt to explain the intent of the parties in
negotiating and signing the Deed.  FWT
also complains of statements that FWT was willing to waive its preferential
right at various times before the December 17, 2007 notice triggered its right.

None of
the complained-of statements are included in or are part of our analysis of the
issues brought by FWT in this appeal, as demonstrated above.  Thus, the trial court could have denied FWT=s motion
for summary judgment and granted Haskin Wallace=s motion
for summary judgment without considering the challenged statements or
evidence.  We overrule FWT=s third
issue.

VII.  Conclusion

Having
overruled FWT=s issues, we affirm the trial
court=s
judgment.

 

 

BILL MEIER

JUSTICE

 

PANEL:  CAYCE, C.J.; MCCOY and
MEIER, JJ.

 

DELIVERED:  November 25, 2009











[1]According to Wallace, Ahot-dip galvanizing is a
process of applying a zinc coating to fabricated iron or steel materials by
immersing the material in a bath consisting of molten zinc.@  Galvanizing assists in corrosion protection
of exposed steel.





[2]In its first amended
counterclaims, FWT alleged, AFWT pleads that all of the conditions precedent
to recovery on its claim for specific performance have been performed or have
occurred.@  It claims that the conditions necessary for
Haskin Wallace=s duty to convey the
Property under the preferential right in the Deed are (1) the right must be
triggered and (2) FWT must exercise the right. 
FWT contends that Haskin Wallace cannot argue that FWT=s preferential right was
not triggered or that FWT failed to properly exercise its preferential right
because Haskin Wallace did not specifically deny those occurrences.





[3]See W. Tex. Transmission,
L.P. v. Enron Corp., 907 F.2d 1554 (5th Cir. 1990), cert. denied, 499 U.S. 906
(1991).





[4]Haskin Wallace argued in
its response to FWT=s motion for summary
judgment that FWT=s preferential right was
not invoked, but it has abandoned that contention in this appeal.  Therefore, we do not address it.





[5]FWT additionally directs
us to out-of-state case law purporting to support its argument.  Like the Texas case law discussed herein, the
out-of-state case law is split on the issue we consider.  See, e.g., Chapman v. Mutual
Life Ins. Co. of N.Y., 800 P.2d 1147, 1151B52 (Wyo. 1990); Crow-Spieker
No. 23 v. Robert L. Helms Constr. & Dev. Co., 731 P.2d 348, 350
(Nev. 1987).





[6]424 S.W.2d 61 (Tex. Civ.
App.CSan Antonio 1967, writ
ref=d n.r.e.).





[7]808 S.W.2d 184 (Tex. App.CHouston [14th Dist.]
1991, writ dism=d).





[8]The court in McMillan
v. Dooley, 144 S.W.3d 159, 181 (Tex. App.CEastland 2004, pet.
denied), even stated of Riley, AThe material issue in the case was whether or not
the preferential purchase right was triggered by the package conveyance.@





[9]93 S.W.3d 215 (Tex. App.CHouston [14th Dist.]
2002, no pet.).





[10]The McMillan court
observed of Comeaux, AThe holding in Comeaux establishes that a
sufficient presentment to the rightholder occurs even though the offer includes
property not covered by the preferential purchase right in the offer presented
to the rightholder.@  McMillan, 144 S.W.3d at 178.





[11]Indeed, in response to
one of Comeaux=s arguments, the court
stated that it did not have to Aaddress whether Comeaux should have been offered
the opportunity to purchase only the leased premises.@  93 S.W.3d at 221.





[12]The court also
distinguished West Texas Transmission, but it did so in the context of
considering Awhether or not the
defendants made a sufficient presentment to Dooley,@ which is not at issue in
this case.  Id. at 176.





[13]249 S.W.3d 526 (Tex. App.CWaco 2008, pet. denied).





[14]The court acknowledged
that A[a] different situation
would exist if Valero had received an option to purchase the pipeline under
terms and conditions specified in the@ agreement setting forth the preferential
right.  Id. at 1568.





[15]On rehearing, one justice
filed a dissenting opinion contending that West Texas Transmission should
not be followed.  Id. at 12
(Cohen, J., dissenting).





[16]No. 03-97-00411-CV, 1998
WL 476728 (Tex. App.CAustin Aug. 13, 1998, no
pet.) (not designated for publication).





[17]A factor to consider in
determining commercial reasonableness is whether the assets as a whole are
related.  In Navasota, the bundled
assetsC a percentage of Gastar=s outstanding stock and
entry into an area of mutual interest comprising numerous counties in East
TexasCwere, at best, minimally
related and severable from the asset the subject of the preferential rightCa working interest in an
area of land.  249 S.W.3d at 530.  In McMillan, the bundle of assets that
McMillan offered Dooley consisted of three separate leases.  144 S.W.3d at 166B67.  In contrast, in this case, both U.S.
Galvanizing and Texas Galvanizing are galvanizing businesses; both were created
and are owned by Haskin, Wallace, and Mason; and U.S. Galvanizing=s 22,500-square-foot
facility, which is specifically designed for galvanizing, sits directly on the
Property.





[18]Indeed, the record
reflects that FWT offered $15.5 million for the galvanizing businesses and
Property.